UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS,

                    Plaintiff,

        v.

SPECIALTY MINERALS INC.,

                    Defendant.

Case No. 1:24-cv-11181

**COMPLAINT**

**INTRODUCTION**

1.      On November 16, 2021, Defendant Specialty Minerals Inc. (SMI), which owns and operates a lime quarry, industrial minerals processing facility, and attendant industrial wastewater treatment facility (Wastewater Facility) at 260 Columbia Street and 0 Howland Avenue in Adams, Massachusetts (the Site), overloaded its Wastewater Facility with industrial process water and other wastewater and stormwater, suffered a broken valve, and discharged alkaline, cloudy white wastewater directly into the Hoosic River.  The discharge turned the river white from bank to bank for approximately thirteen (13) miles downstream, to the Vermont border, depositing white sediment on the river bottom along the way and damaging over two hundred (200) acres of sensitive riverine and wetland resources, including protected habitat of five (5) state-listed rare species.  SMI failed to follow operating, reporting, and maintenance protocols in the lead-up to the November 16 discharge, and SMI continued to unlawfully discharge cloudy white wastewater in violation of applicable federal discharge permit and regulatory requirements in the spring of 2022, exacerbating harm to protected resources downstream.  In January 2023, SMI also discharged untreated, alkaline, and cloudy white

wastewater into its stormwater collection system and then, again, into the Hoosic River. Further, during the second, third, and fourth quarters of 2022, SMI failed to properly monitor its discharges of industrial stormwater in violation of its federally issued industrial stormwater discharge permit.

2.      As a result of SMI's actions and omissions, the Commonwealth of Massachusetts (Commonwealth) brings this action against SMI on behalf of its Department of Environmental Protection (MassDEP) and the Natural Heritage and Endangered Species Program (NHESP) in the Department of Fish and Game's (DFG) Division of Fisheries and Wildlife (DFW) under the Federal Clean Water Act, 33 U.S.C. §§ 1251 *et seq*., as well as the Massachusetts Clean Waters Act, G.L. c. 21, §§ 26–53 (Massachusetts CWA), and its implementing regulations at 314 C.M.R. §§ 3.00 *et seq.* and 12.00 *et seq.* (CWA Regulations); the Massachusetts Wetlands Protection Act, G.L. c. 131, § 40 (WPA), and its implementing regulations at 310 C.M.R. §§ 10.00 *et seq.* (Wetlands Regulations); and the Massachusetts Endangered Species Act, G.L. c. 131A (MESA), and its implementing regulations at 321 C.M.R. §§ 10.00 *et seq.* (MESA Regulations).

3.      For the Defendant's violations of law, the Commonwealth seeks civil penalties and assessments, injunctive relief, fees and costs, and other relief the Court deems appropriate to redress SMI's illegal discharges of pollution.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action and authority to grant the relief requested pursuant to Section 505(a)(1)(A) of the Federal Clean Water Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States) and 28 U.S.C. § 1367 (supplemental jurisdiction over related state claims).

5.      On June 21, 2023, the Commonwealth provided notice of SMI's violations of the Clean Water Act, and of its intention to file suit against SMI (Notice Letter), to the Regional Administrator of the United States Environmental Protection Agency (EPA); the Administrator of EPA Region 1; the Commissioner of MassDEP; and to SMI, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

6.      More than sixty days have passed since notice was served.

7.      This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this complaint.

8.      The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters, and the related health, safety, economic, recreational, aesthetic, ecological, and environmental benefits those waters provide.  The interests of the Commonwealth have been, are being, and will continue to be adversely affected by SMI's failure to comply with environmental laws, as alleged in this Complaint.  The requested relief will redress the harms to the Commonwealth caused by SMI's activities.  SMI's continuing commission of the acts and omissions alleged in this Complaint will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

9.      Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

10.     The Plaintiff is the Commonwealth appearing by and through the Attorney General, MassDEP, and DFW.

11.     The Attorney General, who has her office at One Ashburton Place, in Boston, Massachusetts, is the chief legal officer of the Commonwealth.  She has authority to bring this action and to seek the relief requested pursuant to G.L. c. 131, § 40; G.L. c. 131A, § 6; G.L. c. 21, §§ 42 and 46; and G.L. c. 12, §§ 3 and 11D.

12.     MassDEP is an agency of the Commonwealth charged with administering and enforcing the environmental laws of the Commonwealth including, without limitation, the Massachusetts CWA and the CWA Regulations and the WPA and the Wetlands Regulations.  MassDEP maintains its principal office at 100 Cambridge Street, Suite 900, in Boston, Massachusetts, and has a regional office at 436 Dwight Street in Springfield, Massachusetts.

13.     DFW, a division of DFG, is an agency of the Commonwealth charged with administering MESA and the MESA Regulations.  DFW maintains its principal office at One Rabbit Hill Road in Westborough, Massachusetts.

14.     Defendant SMI is a foreign corporation organized under the laws of Delaware with its principal office at 622 Third Ave, 38th Floor, New York, New York.  SMI owns and operates the quarry, industrial minerals processing facility, and attendant Wastewater Facility at the Site.

## STATUTORY AND REGULATORY BACKGROUND

### Federal Clean Water Act

15.     The Federal Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge complies with certain statutory requirements, including the requirement that both surface water discharges and stormwater discharges comply with individual or general permits issued by EPA under the National Pollutant Discharge Elimination System (NPDES) program.  *See* 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

16.     Under this program, permitted facilities must comply with the detailed standards and requirements set forth in their permits for the operation and maintenance of wastewater treatment plants to protect and enhance water resources.

17.     Here, pursuant to the NPDES surface water discharge permit jointly issued by EPA and MassDEP (NPDES Permit No. MA 0005991) (NPDES Permit), SMI is required, among other things, to limit concentrations of certain pollutants in its effluent discharges, to ensure its discharges do not exceed water quality standards applicable to the Hoosic River, to prevent objectionable discoloration of the Hoosic River, and to properly operate and maintain its wastewater treatment plant to ensure compliance with its permit.

18.     EPA also regulates industrial stormwater under the Federal Clean Water Act.

19.     Industrial stormwater is runoff from precipitation (rain or snow) that lands on industrial sites such as quarries and minerals processing facilities. Stormwater runoff is often polluted by materials that are handled or stored at such facilities and can be harmful to waterbodies, wetlands, and species that inhabit them.

20.     To minimize polluted stormwater discharges from industrial facilities, EPA has issued a general industrial stormwater permit (Stormwater Permit) under the NPDES program that requires certain industrial facilities to monitor for specific pollutants regularly and during measurable storm events.  *See* 86 Fed, Reg. 10,269 (Feb. 19, 2021).

### Massachusetts Clean Waters Act

21.     The Massachusetts CWA, G.L. c. 21, §§ 26–53, similarly establishes a program for the prevention, control, and abatement of water pollution to enhance the quality and value of water resources in the Commonwealth.  Pursuant to that statute, G.L. c. 21, § 27(6), MassDEP has promulgated regulations governing, among other things, discharges to surface water, 314

C.M.R. §§ 3.00 *et seq*., and operation and maintenance of wastewater treatment works, *id.* §§ 12.00 *et seq*.

22.     Under the Massachusetts CWA, as under the Federal Clean Water Act, "[n]o person shall discharge pollutants to surface waters of the Commonwealth" or "engage in any activity . . . which may reasonably result, directly or indirectly, in the discharge of pollutants into waters of the Commonwealth" without a valid permit from MassDEP—in this case, the NPDES Permit jointly issued by EPA and MassDEP—with limitations on discharge of liquid effluent and other conditions designed to preserve surface and ground water quality.  314 C.M.R. §§ 3.03(1), 3.04(1); *see* G.L. c. 21, §§ 27, 42, 43(2).

23.     The CWA Regulations at 314 C.M.R. §§ 3.00 *et seq.* also include standard permit conditions, described further below, that govern discharges into surface waters of the Commonwealth and operation and maintenance of wastewater treatment works to control such discharges, including that NPDES permittees must operate and maintain all facilities and equipment to comply with the terms and conditions of their permits and federal and state law. *See* 314 C.M.R. § 3.19(2), (4).

24.     Additionally, the Massachusetts CWA and CWA Regulations impose detailed standards and requirements for the operation and maintenance of wastewater treatment plants to protect and enhance water resources in the Commonwealth.  *See* G.L. c. 21, §§ 27(9) & (12), 34, 43(7); 314 C.M.R. §§ 12.00 *et seq.*  Among other things, wastewater treatment plants must follow operation, reporting, and maintenance and requirements to ensure safe and effective operation.  *See* 314 C.M.R. §§ 12.03, 12.04, 12.06(2); 257 C.M.R. §§ 2.00 *et seq*.

### Massachusetts Wetlands Protection Act

25.     The WPA, G.L. c. 131, § 40, and Wetlands Regulations, 310 C.M.R. §§ 10.00 *et seq.*, establish a comprehensive regulatory scheme to prevent damage to the Commonwealth's wetland resource areas and to compel restoration of wetland resources that are illegally altered.

26.     The WPA and Wetlands Regulations limit activities in various defined wetlands resource areas, including the beds of rivers and other waterways, called Land Under Water Bodies and Waterways (LUWW).  *See* 310 C.M.R. § 10.04.  LUWW serves many important functions that may be impaired when it is altered, including improving water quality, reducing flood damage, preventing pollution, and providing fisheries and wildlife habitat.  *See id.* §§ 10.02(1), 10.56(1).

27.     Accordingly, anyone who plans to conduct activities that may compromise LUWW must notify, and obtain authorization from, the local Conservation Commission or MassDEP before beginning work.  *See* G.L. c. 131, § 40; 310 C.M.R. §§ 10.02(2)(a), 10.05(4)(a).  Under the WPA, "[n]o person shall remove, fill, dredge or alter any area subject to protection under this section without the required authorization, or cause, suffer or allow such activity . . . ."  G.L. c. 131, § 40, ¶ 32.  And any activity conducted within LUWW may not impair ground and surface water quality or fisheries habitat.  *See* 310 C.M.R. § 10.56(4)(a)2.–3.

28.     In addition, anyone altering wetland resources within estimated habitat of rare wildlife species, designated as such based on reported occurrences of the species over the last twenty-five (25) years, must notify the NHESP of their intent to do so and may not undertake any project that NHESP determines will adversely affect specific rare species or their habitat. *See* 310 C.M.R. §§ 10.56(4)(c), 10.59.

**Massachusetts Endangered Species Act**

29.     MESA, G.L. c. 131A, and the MESA Regulations, 321 C.M.R. §§ 10.00 *et seq*., which are administered by DFW through NHESP, protect state-listed rare species and their habitats throughout the Commonwealth.

30.     MESA and the MESA Regulations provide criteria for the listing of species as "endangered," "threatened," or "species of special concern."  G.L. c. 131A, §§ 1, 4; 321 C.M.R. §§ 10.03, 10.90.  Pursuant to those authorities, NHESP lists species as "endangered" where they are in danger of extinction throughout all or a significant portion of their range, "threatened" where they are at risk of becoming endangered, and "of special concern" where they have suffered a decline that could threaten the species if allowed to continue unchecked or where the species could otherwise easily become threatened within the Commonwealth.  *See* G.L. c. 131A, § 1; 321 C.M.R. §§ 10.03, 10.90.

31.     To ensure the protection of listed rare species, MESA and the MESA Regulations prohibit the "take"—including harming, killing, damaging habitat, and disrupting key behaviors—of such species.  *See* G.L. c. 131A, § 2; 321 C.M.R. § 10.04(1).

32.     And, among other habitat protections, the MESA Regulations provide for designation and protection of habitats that may be important to listed species' survival, called "Priority Habitat."  *See* G.L. c. 131A, §§ 1, 4; 321 C.M.R. §§ 10.03, 10.12.

33.     Before undertaking a project or activity on property designated as Priority Habitat of any state-listed species, property owners must submit project plans to NHESP for a determination whether a "take" of that species will result.  *See* 321 C.M.R. § 10.18(1).

**FACTS**

**Environmental Resources and Rare Species Near the Site**



**Figure 1: SMI Site, Adams, MA (location labels approximate)**

34.     The Hoosic River is an approximately seventy-six (76) mile river that runs north

from Massachusetts, where it passes through downtown North Adams, into Vermont

approximately thirteen (13) miles downstream of the Site, and ultimately into New York where it feeds into the Hudson River.

35.     The  approximately thirteen (13) mile stretch of the Hoosic River between the Site and the Vermont border, including the South Branch of the river, spans approximately two hundred and nineteen (219) acres.

36.     Although it is listed as Warm Water in 314 C.M.R. § 4.06 Table 12, the Commonwealth protects the portion of the river from the Adams WWTP to the Vermont border as a cold-water fish resource, because it serves as habitat for the reproduction, migration, growth, and other critical functions of cold-water aquatic life, such as trout, and DFW has designated it as such.  *See* 314 C.M.R. § 4.06(1)(d)7.; 314 C.M.R. § 9.02 (definition of "Cold Water Fishery"); 321 C.M.R. § 5.00.

37.     The Commonwealth has designated the majority of the Hoosic River between the Site and the Vermont border as a Coldwater Fish Resource because it contains Coldwater Fish that were reproduced in that waterbody or a tributary thereto and use such waters to meet one or more of their life history requirements.

38.     The Commonwealth also has designated significant portions of the Hoosic River between the Site and the Vermont border as a BioMap2 Aquatic Core Habitat.  Aquatic Core Habitats are intact river corridors in which important physical and ecological processes of the river or stream occur.  They delineate integrated and functional ecosystems for fish species and other aquatic Species of Conservation Concern, which include state-listed species as well as Species of Greatest Conservation Need in the State Wildlife Action Plan.

39.     The Hoosic River and its river bottom and banks, including the area downstream of the Site, provide spawning, feeding, breeding, migratory, and overwintering habitat to numerous fish, wildlife, and other species, including multiple state-listed rare species.

40.     Approximately eleven and a half (11.5) acres over approximately ten thousand (10,000) linear feet of the Hoosic River downstream of the Site are designated as both estimated habitat and priority habitat of the Dion Skipper butterfly (*Euphyes dion*), which the Commonwealth has listed as a threatened species at 321 C.M.R. § 10.90, pursuant to 321 C.M.R. § 10.03.

41.     The Dion Skipper is a small orange and black butterfly that inhabits sedge wetlands, including riparian marshes, in Massachusetts.  Dion Skipper adults produce only one brood per year, and larvae feed on wetland sedge plants.  The Dion Skipper is threatened by habitat loss and hydrologic alteration, as well as water pollution.

42.     Approximately six and a half (6.5) acres over approximately five thousand five hundred (5,500) linear feet of the Hoosic River downstream of the Site are designated as priority habitat of the Foxtail Sedge plant (*Carex alopecoidea*), which the Commonwealth has listed as a threatened species at 321 C.M.R. § 10.90, pursuant to 321 C.M.R. § 10.03.

43.     The Foxtail Sedge is a perennial grass-like plant found in wet meadows of river floodplains.  There are currently only ten (10) known stations of Foxtail Sedge in the Commonwealth along three (3) rivers, including the Hoosic River.  The Foxtail Sedge is primarily threatened by loss of natural floodplain habitat.

44.     Approximately one hundred and twelve (112) acres over approximately fifty-three thousand (53,000) linear feet of the Hoosic River downstream of the Site also are designated as both estimated habitat and priority habitat of the Longnose Sucker fish (*Catostomus catostomus*),

which the Commonwealth has listed as a species of special concern at 321 C.M.R. § 10.90, pursuant to 321 C.M.R. § 10.03.

45.     The Longnose Sucker is a copper and silver, torpedo-shaped fish that resides in cool sections of rivers and streams in only four watersheds in Massachusetts.  Longnose Suckers are primarily threatened by habitat alteration as they feed primarily on benthic invertebrates, larvae, and algae.  Their eggs, which sink to river bottoms, need clean, well-oxygenated gravel substrates to develop.

46.     Approximately fifty-three and a half (53.5) acres over approximately forty thousand (40,000) linear feet of the Hoosic River downstream of the Site are designated as priority habitat of the Hairy-fruited Sedge plant (*Carex trichocarpa*), which the Commonwealth has listed as a species of special concern at 321 C.M.R. § 10.90, pursuant to 321 C.M.R. § 10.03.

47.     The Hairy-fruited Sedge is a grass-like plant that occurs in calcareous meadows and swales, particularly near rivers.  Like the Foxtail Sedge, the Hairy-fruited Sedge is primarily threatened by habitat destruction in Massachusetts.

48.     Approximately forty-eight (48) acres over approximately twenty-one thousand (21,000) linear feet of the Hoosic River downstream of the Site also are designated as both estimated habitat and priority habitat of the Wood Turtle (*Glyptemys insculpta*), which the Commonwealth has listed as a species of special concern at 321 C.M.R. § 10.90, pursuant to 321 C.M.R. § 10.03.

49.     The Wood Turtle occurs and spends the majority of the year in perennial mid-sized streams with sandy bottoms and heavily vegetated stream banks.  Wood turtles are primarily threatened by habitat loss, forestry and agricultural activities, and stream pollution.

**Property Description and Wastewater Facility Operations**

50.     SMI's Site consists of multiple parcels containing a large limestone quarry and an associated industrial processing facility on the western side of Columbia Street/Route 8 and the Wastewater Facility on the eastern side of Columbia Street/Route 8.  *See* Figure 1, above.

51.     The Hoosic River runs parallel to the east of the Site.

52.     The Site is located in a mixed residential and industrial area in Adams, Massachusetts.

53.     Dozens of homes and businesses, including farms, are located within a half mile of the Site.

54.     The Site is located approximately one mile south and upstream, and a quarter mile northwest, of areas designated by the Commonwealth as "Environmental Justice Communit[ies]" based on the median household income in the area.  Residents in designated Environmental Justice Communities tend to be isolated from environmental decision making, are often unable to access state environmental resources, and have the potential to be disproportionately impacted by environmental harms and risks.

55.     SMI has owned the Site at all times relevant to this Complaint.

56.     SMI has operated the Site at all times relevant to this Complaint.

57.     SMI produces various forms of calcium carbonate at the Site, including precipitated calcium carbonate.

58.     The precipitated calcium carbonate production process involves, among other things, heating and adding water to limestone mined from the quarry to create hydrated lime, or calcium hydroxide (a process called "slaking") followed by precipitation of calcium carbonate from the hydrated lime solution for use in industrial and food-grade processes.

59.     Calcium hydroxide is a highly alkaline (pH around twelve and a half (12.5) standard units (SU)) colorless white mineral powder.  Exposure to calcium hydroxide can cause skin irritation and chemical burns and blindness.

60.     SMI's slaking and precipitated calcium carbonate processes generate industrial wastewater that SMI discharges into the Wastewater Facility's settling ponds to remove solids prior to adjusting the pH of the wastewater.  Following pH adjustment, the industrial wastewater undergoes further settling to remove solids.

61.     Following treatment of the industrial wastewater, SMI mixes the treated industrial wastewater from its production processes with non-contact cooling water, quarry water, and stormwater run-off generated throughout the quarry and other areas at the Site, and then discharges the combined wastewater directly into the Hoosic River via a discharge channel (Discharge Channel) from a single outfall (numbered 001) (the Outfall) north of the Wastewater Facility.

62.     SMI also collects stormwater runoff through other areas at the Site in catch basins and thereafter directs it to stormwater outfalls covered under the Stormwater Permit, described below.

63.     SMI has failed to submit an updated staffing plan to MassDEP since 2016.

### SMI's Permitting History

64.     EPA and MassDEP authorized SMI to discharge non-contact cooling water, quarry water, stormwater run-off, and treated process water from the Outfall into the Hoosic River in a 2003 jointly issued NPDES Permit (No. MA 0005991) that remains in force.  *See* 40 C.F.R. § 122.6; 314 C.M.R. § 3.09.

65.     As set forth in detail *infra*, the NPDES Permit imposes operating standards, procedures, and effluent discharge limitations for multiple parameters including Total Suspended Solids (TSS), Turbidity, and pH to limit discharges of harmful pollutants into the Hoosic River.

66.     TSS is a measurement of the weight of fine particulate matter that remains suspended, and not dissolved, in a sample of water.  Suspended solids can clog fish gills and reduce light penetration, impairing the ability of algae to produce food and oxygen, and settled solids can bury fish eggs, fish nursery areas, and invertebrate habitat.

67.     Turbidity is a measure of the cloudiness of water, due to particles suspended or dissolved in water that scatter light and reduce clarity.  High turbidity reduces the aesthetic quality of rivers and other waterbodies and can harm fish and other aquatic life by reducing food supplies, affecting gill function, and preventing successful development of fish eggs and larvae.

68.     pH, which stands for power of hydrogen, is a measure of the hydrogen ion concentration of a solution on a logarithmic scale on which seven (7) standard units (SU) is neutral, lower values are more acidic, and higher values are more alkaline.  High alkalinity within a waterbody may cause death; damage to outer surfaces like gills, eyes, and skin; and an inability to dispose of metabolic waste among fish and other aquatic life.

69.     Total Dissolved Solids (TDS) and total calcium are also useful markers of water quality.

70.     TDS is a measure of the dissolved combined content of all inorganic and organic substances present in a molecular, ionized, or microgranular suspended form.  Substances that make up TDS commonly include calcium, phosphates, nitrates, and other constituents found in stormwater runoff or industrial wastewater.

71.     Total Calcium is a measure of the concentration of calcium ions present in water, largely made up of calcium carbonates and often introduced through interaction with limestone.

72.     In addition to the discharges covered under NPDES Permit (No. MA 0005991), SMI has permit coverage under the Stormwater Permit (MAR054010) for discharges of industrial stormwater from Stormwater Permit Outfalls 001, 002, 003, 004, 005, and 006.

73.     As relevant here, the Stormwater Permit requires SMI to conduct quarterly benchmark monitoring for TSS, Total Recoverable Aluminum, and Nitrate plus Nitrite Nitrogen.

74.     Aluminum in surface water can affect some species' ability to regulate ions, like salts, and inhibit respiratory functions, like breathing. Aluminum can accumulate on the surface of a fish's gill, leading to respiratory dysfunction, and possibly death.

75.     An excess of Nitrogen in water causes algae to grow faster than ecosystems can handle. Increased algae can harm water quality, food resources, and habitats, and decrease the oxygen that fish and other aquatic life need to survive.

## Illegal Discharges at the Site

76.     On or before the morning of November 16, 2021, a valve in SMI's slaking process malfunctioned, releasing a large amount of "milk of lime," i.e., hydrated lime (calcium hydroxide), along with calcium carbonate, into the Wastewater Facility.

77.     At the same time, SMI was pumping out its quarry, contributing to an increased flow of water from the Outfall.

78.     By mid-morning on November 16, SMI had begun discharging cloudy, or turbid, wastewater containing entrained solids observed in flowing water from the Outfall directly into the Hoosic River.

79.     The discharge caused the Hoosic River to turn cloudy white, from bank to bank, and deposited lime solids on the river bottom downstream of the Wastewater Facility.

80.     SMI's alarm system did not alert SMI of the excess pollutant concentration resulting from the slake valve malfunction, however.

81.     At approximately 10:00 A.M. on November 16, SMI received a complaint that the Hoosic River downstream of the Wastewater Facility was a milky-white color and that the source of the discoloration was SMI's Outfall.

82.     SMI met with the complainant shortly after 10:00 A.M.

83.     But SMI did not inspect the Outfall to observe the discharge until approximately 12:00 P.M. or notify MassDEP of the discharge until approximately 1:15 P.M.

84.     Instead, SMI began dredging from the Wastewater Facility's treatment ponds, in an apparent attempt to improve the settling of solids, but which served, instead, to cause resuspension of solids and to exacerbate the excess turbidity in the wastewater system.

85.     At the same time, SMI continued its industrial process operations, which continued to direct wastewater containing lime solids substantially beyond what the Wastewater Facility could effectively treat for at least seven (7) more hours.  SMI also continued its quarry-pumping activities, which increased the volume of contaminated water being discharged from the Outfall.

86.     By approximately 11:30 A.M., as a result of the discharges from the Site, the Hoosic River appeared milky white two miles downstream of the Wastewater Facility.

87.     That afternoon, SMI continued to discharge cloudy, white water, with entrained, i.e., suspended, solids visible in flowing water from the Outfall, causing discoloration of the

Hoosic River from bank to bank for approximately thirteen (13) miles downstream, to the Vermont border.

88.     Throughout the afternoon, lime solids were visible on the banks and river bottom at and below the Outfalls.

89.     Although MassDEP ordered SMI to shut down process operations at approximately 4:30 P.M., the effluent discharge from the Outfall was still discolored at 8:00 P.M., with entrained solid particles still visible in flowing water in the Outfall and the Hoosic River.

90.     Despite the ongoing discharges, SMI's certified wastewater operator had left the Wastewater Facility and did not return that night.

91.     Samples taken from the effluent discharge from the Outfall at approximately 4:00 P.M. contained TSS levels of 15,000 milligrams per liter (mg/l), well above the 42 mg/l permit effluent discharge limitation in the NPDES permit.

92.     At 7:00 A.M. on the following morning, November 17, 2021, SMI was still discharging flowing water with visible entrained solids from the Outfall, causing cloudy white discoloration of the Hoosic River below the Outfall.

93.     Following the November 16, 2021, discharge, SMI reported a daily maximum of 281.6 mg/l TSS in its November 30, 2021, discharge monitoring report, exceeding by more than sixfold the 42 mg/l TSS effluent discharge limitation in the NPDES permit.

94.     Following the November 16, 2021, discharge, SMI reported a daily maximum turbidity of 203 Nephelometric Turbidity Units (NTU) in its November 30, 2021, discharge monitoring report, exceeding by approximately threefold the 60 Jackson Turbidity Unit (JTU) turbidity effluent discharge limitation in the NPDES permit.

95.     Before and on November 16, 2021, the route to the Outfall was covered in brush

and, according to SMI, inaccessible to enable monitoring of discharges from the Wastewater Facility.

96.     SMI cited as its reason for failure to sample stormwater during the November 16 event the presence of insufficient operators on site.

**March-April 2022 Events**

97.     Following the November 2021 discharge, on at least fifty-eight (58) occasions between March 3, 2022, and April 29, 2022, SMI again discharged cloudy white wastewater from the Outfall directly into the Hoosic River.

98.     Water samples taken in the Hoosic River on April 4, 2022, from upstream, at, and downstream of the Discharge Channel revealed an increase in multiple water quality parameters, including TSS, Turbidity, pH, TDS, and Total Calcium.

99.     Sediment samples taken from the Hoosic River on April 4, 2022, from upstream, at, and downstream of the Discharge Channel also revealed a significant increase in Total Calcium along the river bottom (from 9,200 milligrams per kilogram (mg/Kg) upstream of the Discharge Channel, to 280,000 mg/Kg in the Discharge Channel just before the confluence with the Hoosic River, to 52,000 mg/Kg downstream of the confluence of the Discharge Channel and the Hoosic River).

**January 2023 Events**

100.    On the morning of January 10, 2023, untreated, turbid white wastewater from SMI's production process overflowed from a containment trough on the outside of one of SMI's wastewater treatment plant buildings.

101.    The untreated wastewater discharged from the trough across the surface of the ground and into a grated drain that subsequently discharged into a stormwater catch basin, then

into a non-process water stormwater collection pond, and from there to the Outfall, where it entered the Hoosic River via the Discharge Channel.

102.    Following the discharge, the stormwater collection ponds appeared cloudy and milky-white, with fine white solid particles floating on the surface.

103.    The pH of the discharge in one of the stormwater ponds measured at 8.68 SUs, while the pH of another, unaffected stormwater pond at the Site measured at only 7.38 SUs.

104.    The discharge turned the Hoosic River cloudy and milky-white at the confluence of the Discharge Channel and the Hoosic River.

105.    The discharge into the stormwater catch basin and resulting discoloration of the stormwater collection pond and the Hoosic River continued through January 11, 2023.

106.    On January 12, the process water overflow was still occurring, with cloudy milky-white wastewater continuing to discharge out of the trough and directly into the stormwater catch basin.

107.    On January 12, fine white solid particles were still visible along the Discharge Channel stream bottom and at the confluence of the Discharge Channel and the Hoosic River.

**Additional Violations**

108.    In and before November 2021, SMI did not maintain functioning alarm systems to notify SMI of excess pollutant concentrations in its Wastewater Facility.

109.    From at least March 2020 to the present, SMI did not submit to MassDEP semi-annual test results of all alarm systems at the Wastewater Facility.

110.    Nor did SMI submit to MassDEP monthly test results of all chemical storage, metering systems, monitoring and associated alarms maintained at the Wastewater Facility for chemical addition from at least March 2020 to the present.

111.   SMI also failed to conduct representative sampling, i.e., sampling proportional to flow, as required to demonstrate compliance with the effluent discharge limitations in the NPDES Permit.

112.   Instead, for at least the last two years, SMI has obtained samples using a time and set based aliquot.

113.   During the rain events listed in **Table 1** below, SMI discharged industrial stormwater from the Site into the Outfalls listed in its Notice of Intent covered by the Stormwater Permit.

| Year | Month | Date |
|------|-------|------|
| 2022 | April | 7, 8, 19, 26 |
| | May | 16, 22 |
| | June | 9, 23 |
| | July | 18, 25 |
| | August | 4 |
| | September | 5, 6, 13, 22 |
| | October | 13, 14, 17 |
| | November | 12, 27, 30 |
| | December | 3, 23 |

**Table 1: Days between April 1, 2022, and December 31, 2022, on which SMI's Stormwater Discharged into Waters of the United States**

114.   Despite repeated qualifying rain events, SMI failed to conduct benchmark monitoring sampling during the second, third, and fourth quarters of 2022.

## CAUSES OF ACTION

### COUNT I.   VIOLATIONS OF THE FEDERAL CLEAN WATER ACT, 33 U.S.C. § 1311(a)

115.   The Commonwealth realleges and incorporates by reference the allegations of Paragraphs 1 through 114 as if they were restated in full.

21

116.    Section 301 of the Clean Water Act provides that "the discharge of any pollutant by any person shall be unlawful" except, as relevant here, in compliance with Section 402.  33 U.S.C. § 1331(a).

117.    Section 402 of the Clean Water Act in turn authorizes EPA to issue permits for the discharge of pollutants with conditions necessary to meet other requirements of the Act, 33 U.S.C. § 1342(a), and permits for the discharge of stormwater from industrial sources, *id.* § 1342(p).

118.    The regulation at 40 C.F.R. § 122.41(a) provides that NPDES permittees must comply with all conditions of their NPDES permit and permit noncompliance constitutes a violation of the Clean Water Act.

119.    The NPDES Permit (§ I.A.1.a.) states that discharges shall not cause a violation of the water quality standards of the receiving waters.

120.    The NPDES Permit (§ II.E.1.a) defines applicable standards and limitations to include all State standards and limitations to which a discharge is subject, including effluent limitations and water quality standards.

121.    The surface water quality standard set forth at 314 C.M.R. § 4.05(3)(b) provides that Class B waters must "have a consistently good aesthetic value."

122.    The surface water quality standard set forth at 314 C.M.R. § 4.05(3)(b)(6) provides that Class B waters must "be free from color and turbidity in concentrations that are aesthetically objectionable or would impair any use assigned to this Class," including irrigation and other agricultural uses and for compatible industrial cooling and process uses.

123.    The surface water quality standard set forth at 314 C.M.R. § 4.05(3)(b)(5) provides that Class B waters must "be free from floating, suspended and settleable solids in

concentrations and combinations that would impair any use assigned to this Class, that would cause aesthetically objectionable conditions, or that would impair the benthic biota or degrade the chemical composition of the bottom."

124.    The NPDES Permit (§ I.A.1.c.) requires that discharges from the Site not cause objectionable discoloration of the receiving waters.

125.    The NPDES Permit (§ I.A.1.d.) requires that discharges from the Site "shall contain neither a visible oil sheen, foam, nor floating solids at any time."

126.    The NPDES Permit (§ II.B.1.) states that the "[t]he permitee shall at all times properly operate and maintain all facilities and systems of treatment and control. . . which are installed or used by the permittee to achieve compliance with the conditions of th[e] permit . . ."

127.    The regulation at 40 C.F.R. § 122.441(e) similarly provides that the NPDES "permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions of the permit."

128.    The NPDES Permit (§ II.B.3.) states that "[t]he permittee shall take all reasonable steps to minimize or prevent any discharge . . . in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment."

129.    The regulation at 40 C.F.R. § 122.41(d) similarly provides that the NPDES "permittee shall take all reasonable steps to minimize or prevent any discharge . . . in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment."

130.    The NPDES Permit (§ II.B.4.) prohibits "bypass," which is defined as "the intentional diversion of waste streams from any portion of a treatment facility."

131.    The NPDES Permit (§ II.D.1.a.) states that "[t]he permitte shall give notice to the Regional Aministrator as soon as possible for any planned physical alterations or additions to the permitted facility."  Notice is required when "[t]he alteration or addition could significantly change the nature or increase the quantity of pollutants discharged."

132.    The NPDES Permit (§ I.A.1.) provides that the TSS in the Wastewater Facility's effluent may not exceed a maximum of forty-two (42) mg/l measured over a twenty-four (24) hour period.

133.    The NPDES Permit (§ I.A.1.) provides that the Turbidity in the Wastewater Facility's effluent may not rise above sixty (60) JTU, which SMI measures in functionally equivalent NTU, measured over a twenty-four (24) hour period.

134.    The NPDES Permit (§ I) requires SMI to obtain samples of flow from the Outfall to demonstrate compliance with the permit.

135.    The regulation at 40 C.F.R. § 122.41(j)(1) provides that "[s]amples and measurements taken for the purpose of monitoring shall be representative of the monitored activity."  To comply with 40 C.F.R. 122.41, SMI must obtain representative samples proportional to flow.  *See* U.S. EPA Interim Revised NPDES Inspection Manual, Ch. 5; Env't Prot. Agency, NPDES Self-Monitoring System User Guide 21 (Jan. 1985).

136.    The Stormwater Permit provides that owners and operators of facilities with stormwater discharges associated with any primary industrial activities and any co-located industrial activities listed in Appendix D of the Stormwater Permit are subject to the requirements of the Stormwater Permit, including monitoring for certain parameters and monitoring during measurable storm events.  *See* Stormwater Permit, Appendix D, pp. D-1 to D-3 (Sector J – Mineral Mining and Processing, Sector E – Glass Clay, Cement, Concrete, and

24

Gypsum Products, Sector C – Chemical and Allied Products Manufacturing and Refining, and

Sector L – Landfill, Land Applications Site, and Open Dumps).

137.    SMI's Stormwater Permit covers six outfalls, Outfalls 001, 002, 003, 004, 005,

and 006, under Sectors J, E, C, and L.

138.    The Stormwater Permit for Sectors J, E, C, and L requires SMI to, among other

things, collect and analyze stormwater samples and document monitoring procedures for

monitoring requirements that apply to the Site, including, among other things, quarterly

benchmark monitoring for TSS, Total Recoverable Aluminum, and Nitrate plus Nitrite Nitrogen.

*See* Stormwater Permit, Sections 4, 8.C.4, 8.E.5, 8.J.9, 8.L.10, pp. 31-44, 78, 84, 143, 152.

139.    Subsection 1362(5) of 33 U.S.C. defines "person" to include "an individual,

corporation, partnership, [or] association."

140.    Subsection 1362(6) of 33 U.S.C. defines "pollutant" as "dredged spoil, solid

waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes,

biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand,

cellar dirt and industrial, municipal, and agricultural waste discharged into water."

141.    Subsection 1362(7) of 33 U.S.C. defines "navigable waters" as "waters of the

United States, including the territorial seas."

142.    Section 26A of G.L. c. 21 defines "[w]aters" and "waters of the

[C]ommonwealth" as "all waters within the jurisdiction of the commonwealth, including,

without limitation, rivers, streams, lakes, ponds, springs, impoundments, estuaries, coastal waters

and groundwaters."  *See also* 314 C.M.R. §§ 3.02 and 12.02.

143.    The regulation at 314 C.M.R. § 3.02 defines "[s]urface [w]aters" to include "all waters other than ground waters within the jurisdiction of the Commonwealth, including, without limitation, rivers . . .[and] streams."

144.    Subsection 1362(12) of 33 U.S.C. defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

145.    Subsection 1362(14) of 33 U.S.C. defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

146.    Subsection 1362(18) of 33 U.S.C. defines "industrial user" as "those industries identified in the Standard Industrial Classification Manual, Bureau of the Budget, 1967, as amended and supplemented, under the category of "Division D—Manufacturing" and such other classes of significant waste producers as, by regulation, the Administrator deems appropriate."

147.    SMI is a "person" within the meaning of 33 U.S.C. § 1362(5).

148.    The cloudy white effluent containing entrained solids visible in flowing water released from SMI's Outfall into the Hoosic River on November 16 and 17, 2021, on March 3 through April 29, 2022, and on January 10, 11, and 12, 2023, is a "pollutant" within the meaning of 33 U.S.C. § 1362(6).

149.    The Hoosic River is a "navigable water" within the meaning of 33 U.S.C. § 1362(7).

150.    The Hoosic River is a "water[] of the [C]ommonwealth" within the meaning of G.L. c. 21, § 26A, and 314 C.M.R. §§ 3.02 and 12.02.

151.    The Hoosic River is a "[s]urface [w]ater[]" within the meaning of 314 C.M.R. § 3.02.

152.    The releases of effluent from SMI's Outfall into the Hoosic River on November 16, 17, and 30, 2021, on March 3 through April 29, 2022, and on January 10, 11, and 12, 2023, are "discharge of a pollutant" within the meaning of 33 U.S.C. § 1362(12).

153.    The Outfall at the Site is a "point source" within the meaning of 33 U.S.C. § 1362(14).

154.    SMI is an "industrial user" within the meaning of 33 U.S.C. § 1362(18).

155.    The direction of improperly processed wastewater to the Outfall without timely action to cease the processes causing the discharge on November 16 and 17, 2021, is a "bypass" within the meaning of the NPDES Permit (§ II.B.4.).

156.    The release of unprocessed wastewater from a trough in SMI's facility, to the stormwater pond, and out of the Outfall on January 10, 11, and 12, 2023, is a "bypass" within the meaning of the NPDES Permit (§ II.B.4.).

157.    The majority of the stretch of the Hoosic River between the Site and the Vermont Border is designated as Class B water pursuant to 314 C.M.R. § 4.06 Table 12.

158.    By causing, suffering, or allowing the discharge of cloudy white effluent from the Outfall into the Hoosic River and thereby causing aesthetically objectionable turbidity and discoloration of the surface waters of a protected class B fishery on November 16 and 17, 2021, on at least fifty-eight (58) separate dates on March 3 through April 29, 2022, and on January 10, 11, and 12, 2023, and in violation of the surface water quality standards in 314 C.M.R. § 4.05(3)(b) and (b)(6), SMI violated the NPDES Permit (§§ I.A.1.a. & I.A.1.c.), 40 C.F.R. § 122.41(a), and 33 U.S.C. § 1311(a).

159.   By causing, suffering, or allowing the discharge of cloudy white effluent containing settleable and suspended solids from the Outfall into the Hoosic River and thereby causing visible floating, suspended, and settleable solids to be present in the surface waters of a protected Class B fishery, which caused aesthetically objectionable conditions and impaired the benthic biota and degraded the chemical composition of the bottom on November 16 and 17, 2021, on at least fifty-eight (58) separate dates on March 3 through April 29, 2022, and on January 10, 11, and 12, 2023, and in violation of the surface water quality standards in 314 C.M.R. § 4.05(3)(b) and (b)(5), SMI violated the NPDES Permit (§§ I.A.1.a., I.A.1.c. & I.A.1.d.), 40 C.F.R. § 122.41(a), and 33 U.S.C. § 1311(a).

160.   By failing to shut down the processes at the Wastewater Facility to prevent further noncompliant discharges on November 16 and 17, 2021, and January 10, 11, and 12, 2023, and thereby failing to properly operate or maintain the Facility to maintain compliance with its NPDES Permit, SMI violated the NPDES Permit (§ II.B.1.), 40 C.F.R. § 122.41(a) and (e), and 33 U.S.C. § 1311(a).

161.   By failing to maintain facility components on November 16 and 17, 2021, on at least fifty-eight (58) separate dates on March 3 through April 29, 2022, and on January 10, 11, and 12, 2023, and thereby failing to properly operate or maintain the Wastewater Facility to maintain compliance with its NPDES Permit, SMI violated the NPDES Permit (§ II.B.1.), 40 C.F.R. § 122.41(a) and (e), and 33 U.S.C. § 1311(a).

162.   By failing to maintain its alarm system in operable condition and thereby failing to properly operate or maintain the Wastewater Facility to maintain compliance with its NPDES Permit, SMI violated the NPDES Permit (§ II.B.1.), 40 C.F.R. § 122.41(a) and (e), and 33 U.S.C. § 1311(a).

28

163.    By failing to maintain an accessible location for sampling collection at the Outfall on November 16 and 17, 2021, and thereby failing to properly operate or maintain the Wastewater Facility to maintain compliance with its NPDES Permit, SMI violated the NPDES Permit (§ II.B.1.), 40 C.F.R. § 122.41(a) and (e), and 33 U.S.C. § 1311(a).

164.    By failing to immediately inspect the Outfall or notify MassDEP after receiving a complaint about turbidity in the receiving waters (Hoosic River) and by declining to take steps to discontinue discharges before and after the process shut-off on November 16, 2021, SMI failed to minimize or prevent discharge in violation of the NPDES Permit that had a reasonable likelihood of adversely affecting human health or the environment and thereby violated the NPDES Permit (§ II.B.3.), 40 C.F.R. § 122.41(a) and (d), and 33 U.S.C. § 1311(a).

165.    By allowing inadequately treated wastewater to bypass portions of the Wastewater Facility and discharge from the Outfall when simultaneously pumping out its quarry during a period of increased precipitation and while SMI was experiencing a failed slake valve on November 16, 2021, SMI violated the NPDES Permit (§ II.B.4.), 40 C.F.R. § 122.41(a), and 33 U.S.C. § 1311(a).

166.    By allowing unprocessed wastewater to bypass the Wastewater Facility and discharge from the Outfall on January 10, 11, and 12, 2023, SMI violated the NPDES Permit (§ II.B.4.), 40 C.F.R. § 122.41(a), and 33 U.S.C. § 1311(a).

167.    By causing, suffering, or allowing the discharge of effluent containing two hundred and eighty-one and six tenths (281.6) mg/L TSS as measured in a twenty-four (24) hour composite in November 2021, SMI violated the effluent discharge limitation for TSS in the NPDES Permit (§ I.A.1.), 40 C.F.R. § 122.41(a), and 33 U.S.C. § 1311(a).

168.    By causing, suffering, or allowing the discharge of effluent with a maximum turbidity of two hundred and three (203) NTU in November 2021, SMI violated the effluent discharge limitation for Turbidity in the NPDES Permit (§ I.A.1.), 40 C.F.R. § 122.41(a), and 33 U.S.C. § 1311(a).

169.    By failing to conduct representative sampling proportional to flow, SMI violated the NPDES Permit (Part I), 40 C.F.R. § 122.41(a) and (j)(1), and 33 U.S.C. § 1311(a).

170.    By failing to conduct benchmark monitoring during the second, third, and fourth quarters of 2022, SMI violated Sections 4, 8.C.4, 8.E.5, 8.J.9, and 8.L.10 of the Stormwater Permit.

171.    Section 505(a)(1) of the Federal Clean Water Act authorizes citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f) and § 1362(5).

172.    The Commonwealth may bring a suit under Section 505 of the Act, because it is a "person" having an interest which is or may be adversely affected. *See* Section 505(g); 33 U.S.C. § 1365(g).

173.    Under Section 505 of the Clean Water Act, this Court has authority to enjoin SMI's violations of the Clean Water Act's prohibition on unauthorized discharges of pollutants and to require SMI to comply with its NPDES and Stormwater Permits.  The Court also has authority to impose penalties of up to $66,712 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R. § 19.4; 88 Fed. Reg. 89,312 (Dec. 27, 2023).

COUNT II.          VIOLATIONS OF THE MASSACHUSETTS CWA, G.L. C. 21, §§ 26–53, AND CWA REGULATIONS, 314 C.M.R. §§ 3.00 *ET SEQ.* AND 12.00 *ET SEQ.*

174.     The Commonwealth realleges and incorporates by reference the allegations of Paragraphs 1 through 173 as if they were restated in full.

175.     Section 43(2) of G.L. c. 21 provides, in relevant part, that "[n]o person shall discharge pollutants into waters of the [C]ommonwealth nor construct, install, modify, operate or maintain an outlet for such discharge or any treatment works, without a currently valid permit issued by the director," and the regulations at 314 C.M.R. §§ 3.03(1) and 3.04(1) provide that "[n]o person shall discharge pollutants to surface waters of the Commonwealth" or "engage in any other activity … which may reasonably result, directly or indirectly, in the discharge of pollutants into waters of the Commonwealth" without a currently valid NPDES permit from MassDEP pursuant to G.L. c. 21, § 43, and 314 C.M.R. §§ 3.00 *et seq.*

176.     In addition to the requirements of the jointly issued NPDES Permit itself, see *supra* Paragraphs 65-75, 119-28, and 130-34, and incorporated herein by reference, the regulation at 314 C.M.R. § 3.19 sets forth standard conditions that apply to all state-issued NPDES permits.

177.     The standard NPDES permit condition set forth at 314 C.M.R. § 3.19(2) provides that "[t]he permittee shall comply at all times with the terms and conditions of the permit, . . . [the CWA Regulations], [the Massachusetts CWA], and all other applicable state and federal statutes and regulations."

178.     The standard NPDES permit condition set forth at 314 C.M.R. § 3.19(1) provides in relevant part that "[n]o discharge authorized in the permit shall result in a violation of the Massachusetts Surface Water Quality Standards (314 C.M.R. § 4.00) . . . or any amendments thereto."

31

179.    The standard NPDES permit condition set forth at 314 C.M.R. § 3.19(4) provides that "[t]he permittee shall at all times properly operate and maintain all facilities and equipment installed or used to achieve compliance with the terms and conditions of the permit, and in accordance with 314 C.M.R. § 12.00."

180.    The standard NPDES permit condition set forth at 314 C.M.R. § 3.19(5) provides that the permittee must take steps to halt or reduce activity to the extent necessary to maintain compliance with permit conditions.

181.    The standard NPDES permit condition set forth at 314 C.M.R. § 3.19(7) provides that the permittee must take all reasonable steps to minimize or prevent any adverse impact on human health or the environment resulting from permit non-compliance.

182.    The standard NPDES permit condition set forth at 314 C.M.R. § 3.19(20)(c) provides that "[t]he permittee shall give notice to [MassDEP] as soon as possible of any planned physical alterations or additions to the permitted facility or activity which could significantly change the nature or increase the quantity of pollutants discharged."

183.    The regulation at 314 C.M.R. § 12.03(3) provides that "[n]o person shall increase the volume or strength or change the characteristics of any discharge in excess of that specified under any existing approval of [MassDEP]."

184.    The regulation at 314 C.M.R. § 12.03(4) provides that "[a]ny person operating a wastewater treatment facility shall comply with 257 CMR 2.00," which governs certification procedures for operators of wastewater treatment facilities.

185.    The regulation at 314 C.M.R. § 12.03(6) provides that "[a]ll sampling and analysis required under 314 CMR 12.00 shall be conducted in compliance with 40 CFR Part 136 or other methods approved by the Department."

186.     To comply with 40 C.F.R. Part 136, SMI shall obtain representative samples proportional to flow.  *See* U.S. EPA Interim Revised NPDES Inspection Manual, Ch. 5.

187.     The regulation at 257 C.M.R. § 2.11, in turn, requires a certified Chief Operator to be "in overall direct responsible charge of the wastewater treatment facility," and a certified Assistant Chief Operator to be "in direct responsible charge during the absence of the Chief Operator."

188.     The regulation at 257 C.M.R. § 2.14 provides that "[n]o person shall manage, operate or maintain a wastewater treatment facility unless the individual in charge of the facility is in possession of a currently valid certificate issued pursuant to 257 C.M.R. § 2.07."

189.     The regulation at 314 C.M.R. § 12.03(4) provides further that "[a]ny person operating wastewater treatment facilities shall prepare and submit to [MassDEP] a staffing plan for review and approval" every two years, and such plan shall thereafter "be implemented as approved."

190.     The regulation at 314 C.M.R. § 12.03(6) provides that "[a]ll wastes shall receive appropriate treatment as required by" the Commonwealth's Surface Water Discharge Program.

191.     The regulation at 314 C.M.R. § 12.03(7) provides, with exception not relevant here, that "[n]o person responsible for the operation of treatment works shall permit wastes to bypass the wastewater treatment facility or any portion, unit or part thereof in violation of a discharge permit."

192.     The regulation at 314 C.M.R. § 12.04(3) provides that "[a]ll wastewater treatment facilities shall be provided with adequate operating personnel to ensure proper operation and the required degree of treatment at all times."

193.     The regulation at 314 C.M.R. § 12.04(9) provides that "[a]ny person operating treatment works shall maintain them in a manner that will ensure proper operation of the works, or any part thereof."

194.     The regulation at 314 C.M.R. § 12.05(12) provides that the permittee shall maintain "[a]ny and all alarm systems provided by wastewater treatment facility operators and sewer system operators" in an operable condition and that the permittee's "operators shall test the alarm systems semiannually and submit all test results to [MassDEP]."

195.     The regulation at 314 C.M.R. § 12.05(13) provides that "[a]ny and all chemical storage, metering systems, monitoring and associated alarms provided at a wastewater treatment facility for chemical addition shall be maintained in an operable condition and tested monthly at a minimum," and that "[o]perators shall test and calibrate the devices annually and shall submit all test results to [MassDEP]."

196.     Section 26A of G.L. c. 21 defines "[p]erson" to include "any . . . public or private corporation or authority, individual, partnership or association, or other entity, including any officer of a public or private agency or organization, upon whom a duty may be imposed by or pursuant to [the Massachusetts CWA]."  *See also* 314 C.M.R. §§ 3.02, 12.02.

197.     Section 26A of G.L. c. 21 defines "[p]ollutant" as "any element or property of sewage, agricultural, industrial or commercial waste, runoff, leachate, heated effluent, or other matter, in whatever form and whether originating at a point or major nonpoint source, which is or may be discharged, drained or otherwise introduced into any sewerage system, treatment works or waters of the [C]ommonwealth."  *See also* 314 C.M.R. §§ 3.02, 12.02.

198.    The regulations at 314 C.M.R. §§ 3.02 and 12.02 define "[d]ischarge or [d]ischarge of [p]ollutants" to include "any addition of any pollutant or combination of pollutants to waters of the Commonwealth from any source."

199.    Section 26A of G.L. c. 21 defines "[t]reatment works" and "facilities" as "any and all devices, processes and properties, real or personal, used in the collection, pumping, transmission, storage, treatment, disposal, recycling, reclamation or reuse of waterborne pollutants." *See also* 314 C.M.R. §§ 3.02 and 12.02.

200.    The regulation at 314 C.M.R. § 12.02 defines "[b]ypass" as "the intentional or unintentional diversion of wastes from any portion of a treatment works."

201.    SMI is a "[p]erson" within the meaning of G.L. c. 21, § 26A and 314 C.M.R. §§ 3.02 and 12.02.

202.    The cloudy white effluent containing entrained solids visible in flowing water released from SMI's Outfall into the Hoosic River on November 16 and 17, 2021, and on March 3 through April 29, 2022, is a "[p]ollutant" within the meaning of G.L. c. 21, § 26A, and 314 C.M.R. §§ 3.02 and 12.02.

203.    The releases of effluent from SMI's Outfall into the Hoosic River on November 16, 17, and 30, 2021, and on March 3 through April 29, 2022, are "[d]ischarge[s]" and "[d]ischarge[s] of [p]ollutants" within the meaning of 314 C.M.R. § 3.02.

204.    The Hoosic River is a "water[] of the [C]ommonwealth" within the meaning of G.L. c. 21, § 26A, and 314 C.M.R. §§ 3.02 and 12.02.

205.    The Hoosic River is a "[s]urface [w]ater[]" within the meaning of 314 C.M.R. § 3.02.

206.     The majority of the stretch of the Hoosic River between the Site and the Vermont Border is designated as Class B water pursuant to 314 C.M.R. § 4.06 Table 12.

207.     SMI's Wastewater Facility is a "[t]reatment works" and "facilit[y]" within the meaning of G.L. c. 21, § 26A, and 314 C.M.R. §§ 3.02 and 12.02.

208.     The diversion of improperly processed wastewater to the Outfall on November 16 and 17, 2021, including after discovery of turbid discharges, is a "bypass" within the meaning of the NPDES Permit (§ II.B.4.) and 314 C.M.R. § 12.02.

209.     The release of untreated wastewater from a trough in the Wastewater Facility, to the stormwater pond, and out of the Outfall on January 10, 11, and 12, 2023, is a "bypass" within the meaning of the NPDES Permit (§ II.B.4.) and 314 C.M.R. § 12.02.

210.     By causing, suffering, or allowing the discharge of cloudy white effluent from the Outfall into the Hoosic River and thereby causing aesthetically objectionable turbidity and discoloration of the surface waters of a protected Class B  fishery on November 16 and 17, 2021, on at least fifty-eight (58) separate dates on March 3 through April 29, 2022, and on January 10, 11, and 12, 2023, SMI violated the surface water quality standards in 314 C.M.R. § 4.05(3)(b) and (b)(6), 314 C.M.R. §§ 3.19(1), (2), and (4), the NPDES Permit  (§§ I.A.1.a. & I.A.1.c.), and G.L. c. 21, § 43(2).

211.     By causing, suffering, or allowing the discharge of cloudy white effluent containing settleable and suspended solids from the Outfall into the Hoosic River and thereby causing visible floating, suspended, and settleable solids to be present in the surface waters of a Class B fishery, which caused aesthetically objectionable conditions and impaired the benthic biota and degraded the chemical composition of the bottom on November 16 and 17, 2021, on at least fifty-eight (58) separate dates on March 3 through April 29, 2022, and on January 10, 11,

36

and 12, 2023, SMI violated the surface water quality standards in 314 C.M.R. § 4.05(3)(b) and

(b)(5), 314 C.M.R. §§ 3.19(1), (2), and (4), the NPDES Permit  (§§ I.A.1.a. & I.A.1.d.), and G.L.

c. 21, § 43(2).

212.    By failing to halt its quarry-pumping operations for at least five (5) hours after

discovering its permit violations during a period of increased precipitation, and by exacerbating

the turbidity of the wastewater by conducting settling pond cleaning, and by failing to shut down

process lines to the Wastewater Facility to prevent further noncompliant discharges until at least

seven (7) hours after learning of such discharges on November 16, 2021, SMI failed to control

production and discharges to maintain compliance with its permit upon failure of the treatment

facility, and thereby violated 314 C.M.R. § 3.19(2), (4), and (5), and G.L. c. 21, § 43(2).

213.    By failing to immediately inspect the Outfall or notify MassDEP after receiving a

complaint about turbidity in its receiving waters and by declining to take steps to discontinue

discharges before and after the process shut-off on November 16, 2021, SMI failed to minimize

or prevent any adverse impact on human health or the environment from non-compliance with its

NPDES Permit, and thereby violated the NPDES Permit (§ II.B.3.), 314 C.M.R. § 3.19(2) and

(7), and G.L. c. 21, § 43(2).

214.    By changing the characteristics of discharges from the Outfall in excess of

NPDES Permit limits on November 16 and 17, 2021, on at least fifty-eight (58) separate dates on

March 3 through April 29, 2022, and on January 10, 11, and 12, 2023, SMI violated 314 C.M.R.

§§ 3.19(2) and 12.03(3) and G.L. c. 21, § 43(2).

215.    By failing to update its staffing plan every two years since 2016, and thereby

failing to properly operate the Wastewater Facility to maintain compliance with its NPDES

Permit, SMI violated the NPDES Permit (§ II.B.1.), 314 C.M.R. §§ 3.19(2), 12.03(4), 12.04(3), 12.04(4), 257 C.M.R. §§ 2.11, 2.14, and, accordingly, G.L. c. 21, § 43(2).

216.    By failing to ensure that all wastes from the Wastewater Facility received appropriate treatment before discharge to avoid violating the provisions of 314 C.M.R. §§ 3.00 *et seq*. on November 16 and 17, 2021, on at least fifty-eight (58) separate dates on March 3 through April 29, 2022, and on January 10, 11, and 12, 2023, SMI violated 314 C.M.R. §§ 3.19(2) and 12.03(6), and G.L. c. 21, § 43(2).

217.    By allowing improperly processed wastewater to bypass portions of the Wastewater Facility on November 16, 2021, SMI violated the NPDES Permit (§ II.B.4.), 314 C.M.R. §§ 3.19(2) and (4) and 12.03(7), and G.L. c. 21, § 43(2).

218.    By allowing unprocessed wastewater to bypass the Wastewater Facility and discharge from the Outfall on January 10, 11, and 12, 2023, SMI violated the NPDES Permit (§ II.B.4.), 314 C.M.R. §§ 3.19(2) and (4) and 12.03(7), and G.L. c. 21, § 43(2).

219.    By failing to shut down the process lines to the Wastewater Facility to prevent further noncompliant discharges on January 10, 11, and 12, 2023, SMI failed to control production and discharges to maintain compliance with its permit upon failure of the treatment facility and thereby violated the NPDES Permit (§ II.B.1.), 314 C.M.R. § 3.19(2), (4), and (5), and G.L. c. 21, § 43(2).

220.    By failing to maintain the Wastewater Facility in a manner that ensured proper operation of treatment works on November 16 and 17, 2021, on at least fifty-eight (58) separate dates on March 3 through April 29, 2022, and on January 10, 11, and 12, 2023, SMI violated the NPDES Permit (§ II.B.1), 314 C.M.R. §§ 3.19(2) and (4) and 12.04(9), G.L. c. 21, § 43(2).

221.    By failing to maintain its alarm system in operable condition, and thereby failing to properly operate and maintain the Wastewater Facility to maintain compliance with its NPDES Permit, SMI violated the NPDES Permit (§ II.B.1), 314 C.M.R. §§ 3.19(2), 12.05(12), and 12.05(13), and G.L. c. 21, § 43(2).

222.    By failing to submit semiannual alarm test results to MassDEP for, at least, the past two (2) years, SMI violated 314 C.M.R. §§ 3.19(2) and 12.05(12) and G.L. c. 21, § 43(2).

223.    By failing to submit test results for chemical storage, metering systems, monitoring and associated alarms at the Wastewater Facility to MassDEP for, at least, the past two (2) years, SMI violated 314 C.M.R. §§ 3.19(2) and 12.05(13), and G.L. c. 21, § 43(2).

224.    By failing to maintain an accessible location for sampling collection at the Outfall on November 16 and 17, 2021, and thereby failing to properly maintain the Facility to maintain compliance with its NPDES Permit, SMI violated the NPDES Permit (§ II.B.1.), 314 C.M.R. §§ 3.19(2), and G.L. c. 21, § 43(2).

225.    By causing, suffering, or allowing the discharge of effluent containing two hundred and eighty-one and six tenths (281.6) mg/L TSS as measured in a twenty-four (24) hour composite in November 2021, SMI violated the effluent discharge limitation for TSS in the NPDES Permit (§ I.A.1.), 314 C.M.R. § 3.19(2) and (4), and G.L. c. 21, § 43(2).

226.    By causing, suffering, or allowing the discharge of effluent with a maximum turbidity of two hundred and three (203) NTU in November 2021, SMI violated the effluent discharge limitation for Turbidity in the NPDES Permit (§ I.A.1.), 314 C.M.R. § 3.19(2) and (4), and G.L. c. 21, § 43(2).

227.    By failing to conduct representative sampling proportional to flow, SMI violated the NPDES Permit (Part I), 314 C.M.R. § 3.19(2) and (4) and 12.06(2), and G.L. c. 21, § 43(2).

228.    Pursuant to G.L. c. 21, § 42, any person who, directly or indirectly, throws, drains, runs, discharges or allows the discharge of any pollutant into waters of the Commonwealth, except in conformity with a permit issued under G.L. c. 21, §§ 27 or 43, or who violates any provision of G.L. c. 21 or any regulation, order, or permit issued thereunder shall be subject to a civil penalty of up to fifty thousand dollars ($50,000) per day for such violation.

**COUNT III.   VIOLATIONS OF THE WPA, G.L. C. 131, § 40, AND WETLANDS REGULATIONS, 310 C.M.R. §§ 10.00 *ET SEQ.***

229.    The Commonwealth realleges and incorporates by reference the allegations of Paragraphs 1 through 228 as if they were restated in full.

230.    The WPA and Wetlands Regulations provide, with exceptions not relevant here, that no person shall alter areas subject to the WPA's protection, or cause, suffer, or allow such activity, without first filing a Notice of Intent with the appropriate local Conservation Commission and obtaining an Order of Conditions from the Conservation Commission or a Superseding or Final Order of Conditions from MassDEP permitting the activity.  *See* G.L. c. 131, § 40, ¶ 1; 310 C.M.R. §§ 10.02(2)(a), 10.05(4)(a), 10.08(1)(c).

231.    The regulation at 310 C.M.R. § 10.56(4)(a)2.–3. provides that, with exceptions not relevant here, any work in LUWW shall not impair ground and surface water quality and the capacity of land to provide breeding habitat, escape cover, and food for fisheries.

232.    The regulation at 310 C.M.R. § 10.56(4)(c) provides that no project may be permitted which will have any adverse effect on specified habitat sites of rare vertebrate or invertebrate species.

233.    The regulations at 310 C.M.R. §§ 10.56(4)(c) and 10.59 provide that if a project proposed in resource areas is within estimated habitat of state-listed rare wetlands wildlife species (as reflected on NHESP's Estimated Habitat Map of State-listed Rare Wetlands Wildlife,

published in accordance with 321 C.M.R. § 10.12), the Notice of Intent also shall be sent to NHESP for determination whether the resource area that would be altered is, in fact, within the habitat of a state-listed species and, if so, for determination by NHESP and the permitting authority whether any proposed work will have an adverse effect on the resource area habitat of the rare species, in which case no such work shall be permitted.

234.    The WPA defines "[p]erson" to "include any company, . . . or any other legal entity or its legal representative, agents or assigns." G.L. c. 131, § 40.

235.    Areas subject to the protection under the WPA and its regulations include LUWW. *See* G.L. c. 131, § 40; 310 C.M.R. § 10.02(1)(b).

236.    The regulation at 310 C.M.R. § 10.56(2) defines LUWW as "the land beneath any creek, river, stream, pond or lake . . . composed of organic muck or peat, fine sediments, rocks or bedrock," bounded by the water body's "mean annual low water level." *See also* 310 C.M.R. §§ 10.02(1)(a)–(b).

237.    The regulation at 310 C.M.R. § 10.04 defines "[a]lter" as "to change the condition of" any area subject to the protection under the WPA, including, without limitation, "the changing of . . . physical, biological or chemical characteristics of the receiving water."

238.    The regulation at 310 C.M.R. § 10.04 defines "[r]are [s]pecies" as "those vertebrate and invertebrate animal species officially listed as endangered, threatened, or of special concern" by DFW under the MESA Regulations.

239.    SMI is a "[p]erson" within the meaning of G.L. c. 131, § 40, and 310 C.M.R. §§ 10.00 *et seq*.

240.    The land underlying the Hoosic River between the Site and the Vermont Border is LUWW within the meaning of 310 C.M.R. §§ 10.02(1)(a)–(b) and 10.56(2).

241. By causing, suffering, or allowing the discharge of calcium hydroxide into the Hoosic River downstream of the Site and thereby increasing the river's Total Suspended Solids, Turbidity, and pH, SMI changed the physical, biological and chemical characteristics of the Hoosic River and thus "[a]lter[ed]" approximately two hundred and nineteen (219) acres of LUWW underlying the Hoosic River downstream of the Site within the meaning of 310 C.M.R. § 10.04.

242. The Dion Skipper is an invertebrate species listed by DFW pursuant to 321 C.M.R. § 10.03 as a threatened species at 321 C.M.R. § 10.90 and is thus a "[r]are [s]pecies" within the meaning of 310 C.M.R. § 10.04.

243. The Longnose Sucker is a vertebrate species listed by DFW pursuant to 321 C.M.R. § 10.03 as a species of special concern at 321 C.M.R. § 10.90 and is thus a "[r]are [s]pecies" within the meaning of 310 C.M.R. § 10.04.

244. The Wood Turtle is a reptile species listed by DFW pursuant to 321 C.M.R. § 10.03 as a species of special concern at 321 C.M.R. § 10.90 and is thus a "[r]are [s]pecies" within the meaning of 310 C.M.R. § 10.04 and G.L. c. 131, § 40.

245. Approximately eleven and a half (11.5) acres over approximately ten thousand (10,000) linear feet of the Hoosic River downstream of the Site are within estimated habitat of the Dion Skipper on the Estimated Habitat Map of State-listed Rare Wetlands Wildlife.

246. Approximately one hundred and twelve (112) acres over approximately fifty-three thousand (53,000) linear feet of the Hoosic River downstream of the Site are within estimated habitat of the Longnose Sucker on the Estimated Habitat Map of State-listed Rare Wetlands Wildlife.

247.    Approximately forty-eight (48) acres over approximately twenty-one thousand (21,000) linear feet of the Hoosic River downstream of the Site are within estimated habitat of the Wood Turtle on the Estimated Habitat Map of State-listed Rare Wetlands Wildlife.

248.    By failing to file a Notice of Intent with the Adams Conservation Commission and by failing to obtain an Order of Conditions from the Adams Conservation Commission or a Superseding Order of Conditions from MassDEP before altering LUWW underlying the Hoosic River downstream of the Site, or causing, suffering, or allowing such activity, SMI violated 310 C.M.R. §§ 10.02(2)(a), 10.05(4)(a), and 10.08(1)(c) and G.L. c. 131, § 40.

249.    By altering the LUWW underlying the Hoosic River downstream of the Site so that surface water quality and its capacity to provide breeding habitat, escape cover, and food for fisheries were impaired, or by causing, suffering, or allowing such activity, SMI violated 310 C.M.R. § 10.56(4)(a)2.–3. and G.L. c. 131, § 40.

250.    By adversely impacting specified habitat sites of rare vertebrate and invertebrate species, SMI violated 310 C.M.R. § 10.56(4)(c) and G.L. c. 131, § 40.

251.    By failing to file a Notice of Intent with NHESP for determination whether the Hoosic River downstream of the Site is within the habitat of state-listed rare species and, if so, whether SMI's discharges will have an adverse effect on resource area habitat of rare wildlife species before altering the LUWW underlying the Hoosic River downstream of the Site, or causing, suffering, or allowing such activity, SMI violated 310 C.M.R. § 10.59 and G.L. c. 131, § 40.

252.    Pursuant to G.L. c. 131, § 40, any person who violates the WPA or Wetlands Regulations shall be subject to a civil penalty of up to twenty-five thousand dollars ($25,000) for each violation.

**COUNT IV.   VIOLATIONS OF MESA, G.L. C. 131A, AND THE MESA REGULATIONS, 321 C.M.R. §§ 10.00 *ET SEQ.***

253.    The Commonwealth realleges and incorporates by reference the allegations of Paragraphs 1 through 252 as if they were restated in full.

254.    MESA and the MESA Regulations provide that no person may "[t]ake" any state-listed threatened species or species of special concern.  G.L. c. 131A, § 2; 321 C.M.R. § 10.04(1).

255.    The MESA Regulations also provide that, before undertaking a project or activity on property designated as Priority Habitat of any endangered, threatened, or special concern species, the Record Owner of the land where such project or activity will occur shall submit its project plans and all other information set forth at 321 C.M.R. § 10.20 to NHESP for a determination whether a "take" will result from any temporary or permanent modification, degradation, or destruction of Priority Habitat.  321 C.M.R. § 10.18(1).

256.    Section 1 of G.L. c. 131A and 321 C.M.R. § 10.02 define "[p]erson" to include any "corporation, partnership, trust, association or other private entity."

257.    The regulation at 321 C.M.R. § 10.02 defines "[s]tate-listed [s]pecies" to include any species found on the Massachusetts list of Endangered, Threatened, and Special Concern species found at 321 C.M.R. § 10.90.

258.    Section 1 of G.L. c. 131A defines "[t]hreatened [s]pecies" as "any species of plant or animal likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range including, but not limited to, species listed from time to time as 'threatened' under the provisions of the Federal Endangered Species Act of 1973, as amended, and any species declining or rare as determined by biological research and inventory and likely to become endangered in the foreseeable future," and the regulation at 321 C.M.R. § 10.02

defines "[t]hreatened [s]pecies" as "any species of plant or animal listed as a Threatened species pursuant to 321 CMR 10.03 and so listed at 321 CMR 10.90."

259.   Section 1 of G.L. c. 131A defines "[s]pecies of [s]pecial [c]oncern" as "any species of plant or animal which has been documented by biological research and inventory to have suffered a decline that could threaten the species if allowed to continue unchecked or that occurs in such small numbers or with such a restricted distribution or specialized habitat requirements that it could easily become threatened within the [C]ommonwealth," and the regulation at 321 C.M.R. § 10.02 defines "[s]pecies of [s]pecial [c]oncern" as "any species of plant or animal listed as a Species of Special Concern pursuant to 321 CMR 10.03 and so listed at 321 CMR 10.90."

260.   Section 1 of G.L. c. 131A and 321 C.M.R. § 10.02 define "[t]ake," in reference to animals, as "to harass, harm, pursue, hunt, shoot, hound, kill, trap, capture, collect, process, disrupt the nesting, breeding, feeding or migratory activity or attempt to engage in any such conduct, or to assist such conduct," and, in reference to plants, as " to collect, pick, kill, transplant, cut or process or attempt to engage or to assist in any such conduct."  The regulation at 321 C.M.R. § 10.02 further provides that "[d]isruption of nesting, breeding, feeding or migratory activity may result from, but is not limited to, the modification, degradation or destruction of Habitat."

261.   The regulation at 321 C.M.R. § 10.02 defines "[h]abitat" as "an area which, due to its physical or biological features, protects or provides important elements for the growth and survival of plants or animals such as food, shelter, or living space, and includes without limitation, breeding, feeding, resting, migratory, or overwintering areas," and "[p]hysical or biological features include, but are not limited to: structure and composition of the vegetation;

faunal community; soils; water chemistry and quality; and geologic, hydrologic, and microclimatic factors."

262.    The regulation at 321 C.M.R. § 10.02 defines "[p]riority [h]abitat" as "the geographic extent of Habitat for State-listed Species as delineated by [DFW] pursuant to 321 CMR 10.12.  Priority Habitats are delineated based on records of State-listed Species observed within the 25 years prior to delineation and contained in [DFW]'s NHESP database."

263.    The regulation at 321 C.M.R. § 10.02 defines "[p]roject or [a]ctivity" as "any action, including, but not limited to: (a) . . . draining, dumping, . . . or discharging."

264.    The regulation at 321 C.M.R. § 10.02 defines "[r]ecord [o]wner" as "any person or entity holding a legal or equitable interest, right or title to real property, as reflected in a written instrument or recorded deed, or any person authorized in writing by any such person."

265.    SMI is a "[p]erson" within the meaning of G.L. c. 131A, § 1, and 321 C.M.R. § 10.02.

266.    The Dion Skipper is an invertebrate species listed by DFW pursuant to 321 C.M.R. § 10.03 as a threatened species at 321 C.M.R. § 10.90 and is thus a "[t]hreatened [s]pecies" and "[s]tate-listed [s]pecies" within the meaning of G.L. c. 131A, § 1, and 321 C.M.R. § 10.02.

267.    The Foxtail Sedge is a plant species listed by DFW pursuant to 321 C.M.R. § 10.03 as a threatened species at 321 C.M.R. § 10.90 and is thus a "[t]hreatened [s]pecies" and "[s]tate-listed [s]pecies" within the meaning of G.L. c. 131A, § 1, and 321 C.M.R. § 10.02.

268.    The Longnose Sucker is a vertebrate species listed by DFW pursuant to 321 C.M.R. § 10.03 as a species of special concern at 321 C.M.R. § 10.90 and is thus a "[s]pecies of

[s]pecial [c]oncern" and "[s]tate-listed [s]pecies" within the meaning of G.L. c. 131A, § 1, and 321 C.M.R. § 10.02.

269.    The Hairy-fruited Sedge is a plant species listed by DFW pursuant to 321 C.M.R. § 10.03 as a species of special concern at 321 C.M.R. § 10.90 and is thus a "[s]pecies of [s]pecial [c]oncern" and "[s]tate-listed [s]pecies" within the meaning of G.L. c. 131A, § 1, and 321 C.M.R. § 10.02.

270.    The Wood Turtle is a reptile species listed by DFW pursuant to 321 C.M.R. § 10.03 as a species of special concern at 321 C.M.R. § 10.90 and is thus a "[r]are [s]pecies" within the meaning of 310 C.M.R. § 10.04.

271.    Approximately eleven and a half (11.5) acres over approximately ten thousand (10,000) linear feet of the Hoosic River downstream of the Site protects and provides important elements for the growth and survival of the Dion Skipper, and thus constitute "[h]abitat" of, and is within an area designated by DFW pursuant to 321 C.M.R. § 10.12 as Priority Habitat for, the Dion Skipper.

272.    Approximately six and a half (6.5) acres over approximately five thousand five hundred (5,500) linear feet of the Hoosic River downstream of the Site protects and provides important elements for the growth and survival of the Foxtail Sedge, and thus constitute "[h]abitat" of, and is within an area designated by DFW pursuant to 321 C.M.R. § 10.12 as Priority Habitat for, the Foxtail Sedge.

273.    The area at the Outfall at the Site, and approximately one hundred and twelve (112.0) acres over approximately fifty-three thousand (53,000) linear feet of the Hoosic River downstream of the Site, protect and provide important elements for the growth and survival of

the Longnose Sucker, and thus constitute "[h]abitat" of, and is within an area designated by DFW pursuant to 321 C.M.R. § 10.12 as Priority Habitat for, the Longnose Sucker.

274.     Approximately fifty-three and a half (53.5) acres over approximately forty thousand (40,000) linear feet of the Hoosic River downstream of the Site protects and provides important elements for the growth and survival of the Hairy-fruited Sedge, and thus constitutes "[h]abitat" of, and is within an area designated by DFW pursuant to 321 C.M.R. § 10.12 as Priority Habitat for, the Hairy-fruited Sedge.

275.     Approximately forty-eight (48.0) acres over approximately twenty-one thousand (21,000) linear feet of the Hoosic River downstream of the Site protects and provides important elements for the growth and survival of the Wood Turtle, and thus constitutes "[h]abitat" of, and is within an area designated by DFW pursuant to 321 C.M.R. § 10.12 as Priority Habitat for, the Wood Turtle.

276.     At all relevant times, SMI held legal title to the Site and was therefore a "[r]ecord [o]wner" within the meaning of 321 C.M.R. § 10.02.

277.     SMI's recurring discharges of cloudy white effluent on November 16 and 17, 2021, on approximately fifty-eight (58) occasions in March and April 2022, and on January 10, 11, and 12, 2023, are [p]roject[s]" and "[a]ctivit[ies]" within the meaning of 321 C.M.R. § 10.02.

278.     By commencing projects and activities, or causing, suffering, or allowing projects and activities to commence, in Priority Habitat at the Site without first filing its project plans and any other information set forth at 321 C.M.R. § 10.20 with NHESP and obtaining a determination that no "take" of the Dion Skipper, Foxtail Sedge, Longnose Sucker, Hairy-fruited Sedge, and Wood Turtle would result from its activities, SMI violated 321 C.M.R. §§ 10.18 and 10.20 and G.L. c. 131A, § 4.

279.    Under G.L. c. 131A, § 6(c), this Court is authorized to enjoin violations of, or to grant such additional relief as it deems necessary or appropriate, to secure compliance with G.L. c. 131A.

280.    Pursuant to G.L. c. 131A, § 6(c) and (d), any person who violates G.L. c. 131A, § 2, or any rule or regulation adopted under G.L. c. 131A shall be subject to a civil assessment of up to $10,000 for each such violation to be paid to the Commonwealth's Natural Heritage and Endangered Species Fund established pursuant to G.L. 10, § 35D, and the commission of a prohibited act with respect to each individual animal or plant shall constitute a separate violation.

## REQUEST FOR RELIEF

Wherefore, the Commonwealth requests that this Court grant the following relief:

A.    Require SMI to comply with its NPDES and Stormwater Permits;

B.    Order SMI to pay civil penalties of up to $64,618 per day for each of SMI's prior violations of the Federal Clean Water Act;

C.    Order SMI to pay to the Commonwealth a civil penalty of fifty thousand dollars ($50,000) for each day of each violation of the Massachusetts CWA and CWA Regulations;

D.    Order SMI to pay to the Commonwealth a civil penalty of twenty-five thousand dollars ($25,000) for each day of each violation of the WPA and Wetlands Regulations;

E.    Order SMI to pay to the Commonwealth's Natural Heritage and Endangered Species Fund, established pursuant to G.L. c. 10, § 35D, a civil assessment of ten

thousand dollars ($10,000) for each day of each violation of MESA and MESA
Regulations;

F.    Issue a permanent injunction that requires SMI to upgrade the Wastewater
Facility and associated operations to ensure compliance with its federal NPDES
and Stormwater Permits, to protect waters of the Commonwealth, and to preserve
and conserve such areas on or near the Site as MassDEP and DFW deem
necessary to compensate for the loss of the interests protected under the
Massachusetts CWA, CWA Regulations, WPA, Wetlands Regulations, MESA,
and MESA Regulations that were caused by SMI's discharges, including, without
limitation, protection of water quality, wetlands functions, and rare species
habitat; and

G.    Award the Commonwealth's costs (including reasonable investigative, attorney,
witness, and consultant fees) as authorized by the Federal Clean Water Act, 33
U.S.C. § 1365(d).

H.    Award any such other and further relief as this Court may deem appropriate.

Dated: May 3, 2024

Respectfully submitted,

THE COMMONWEALTH OF MASSACHUSETTS

By its attorneys,
ANDREA JOY CAMPBELL
ATTORNEY GENERAL


By:_____/s/ Turner Smith_____
Turner Smith, BBO No. 684750
Assistant Attorney General & Deputy Chief
Julia Jonas-Day, BBO No. 703539
Emily Mitchell Field, BBO No. 703726
Assistant Attorneys General
Energy and Environment Bureau
1 Ashburton Place, 18th Floor
Boston, MA 02108
(617) 963-2782
turner.smith@mass.gov