COMMONWEALTH OF
MASSACHUSETTS,

          Plaintiff,

v.

SPECIALTY MINERALS INC.,

          Defendant.

Case No.  1:24-cv-11181

## CONSENT DECREE

WHEREAS, Specialty Minerals Inc. ("SMI" or "Defendant"), owns and operates a lime quarry, industrial minerals processing facility, and attendant industrial wastewater treatment facility ("Wastewater Facility"), which are located at 260 Columbia Street and 0 Howland Avenue in Adams, Massachusetts, and surrounding parcels (the "Site");

WHEREAS, the Commonwealth of Massachusetts ("Commonwealth"), acting through the Office of the Attorney General ("AGO"), brings this action on behalf of its Department of Environmental Protection ("DEP") and the Natural Heritage and Endangered Species Program ("NHESP") in the Department of Fish and Game's ("DFG") Division of Fisheries and Wildlife ("DFW") against SMI under the Federal Clean Water Act, 33 U.S.C. §§ 1251 *et seq*., as well as the Massachusetts Clean Waters Act, G.L. c. 21, §§ 26–53 ("Massachusetts CWA"), and its implementing regulations at 314 C.M.R. §§ 3.00 *et seq*. and 12.00 *et seq*. ("CWA Regulations"); the Massachusetts Wetlands Protection Act, G.L. c. 131, § 40 ("WPA"), and its implementing regulations at 310 C.M.R. §§ 10.00 *et seq*. ("Wetlands Regulations"); and the Massachusetts

Endangered Species Act, G.L. c. 131A ("MESA"), and its implementing regulations at 321 C.M.R. §§ 10.00 *et seq*. ("MESA Regulations");

WHEREAS, the Commonwealth alleges in its complaint that SMI violated both the Authorization to Discharge Under the National Pollutant Discharge Elimination System (NPDES Permit No. MA0005991) issued to SMI jointly by the United States Environmental Protection Agency ("EPA") and DEP on September 16, 2003 ("NPDES Permit") and the EPA Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity issued by the EPA and effective March 1, 2021 ("Stormwater Permit"), in violation of the Federal Clean Water Act, 33 U.S.C. §1331(a);

WHEREAS, by letter dated June 21, 2023, the AGO provided notice of the alleged violations and of the AGO's intention to file suit against SMI (the "Notice") to the Administrator of EPA; to the Administrator of EPA Region 1; to DEP; and to SMI, pursuant to Section 505 of the Federal Clean Water Act, 33 U.S.C. § 1365;

WHEREAS, today, the Attorney General filed a complaint against SMI in the United States District Court, District of Massachusetts (the "Complaint"), which constitutes diligent prosecution of a civil action in a court of the United States under 33 U.S.C. § 1365;

WHEREAS, SMI does not admit to any of the facts or interpretations of law referenced, alleged, or relied upon by the Commonwealth in the Notice or Complaint and does not admit to any liability arising out of the facts or laws referenced, alleged, or relied upon in the Notice or Complaint;

WHEREAS, SMI continues to allege that: the incidents that are the subject of the Complaint were not the result of any negligence on the part of SMI and its personnel; all SMI personnel have fully cooperated with the Commonwealth regarding the incidents described in the

Complaint; the Wastewater Facility was properly staffed, operated, and maintained at all times relevant to the Complaint; and SMI timely undertook appropriate and reasonable actions to prevent and mitigate any unpermitted discharge(s) and any potential harm to the environment;

WHEREAS, SMI further continues to allege that: as soon as practicable following the initial incident, SMI voluntarily engaged a qualified third-party consultant to independently evaluate and confirm that there were no detrimental environmental impacts to the Hoosic River and/or its related environment from the incidents that are the subject of the Complaint; and such report by the independent consultant was voluntarily provided to the Commonwealth;

WHEREAS, the activities conducted pursuant to this Consent Decree and its Exhibits, including the efforts set forth in Paragraphs 17 – 27 and the Scope of Work attached hereto as Exhibit C (the "Scope of Work") have been requested by the Commonwealth as a condition of the Commonwealth entering into this Consent Decree and are being undertaken and completed by SMI as a requirement imposed by this Consent Decree without further approvals by the Commonwealth under the laws and regulations identified in the Notice and Complaint, except as detailed herein;

WHEREAS, the Commonwealth and SMI (collectively, the "Parties") have reached an agreement to fully resolve the alleged facts and claims set forth in the Notice and Complaint;

WHEREAS, this Consent Decree has been negotiated by the Parties in good faith and at arm's length; that implementation of this Consent Decree will avoid prolonged and complicated litigation between the Parties; and that this Consent Decree is in the public interest; and

WHEREAS, this Consent Decree shall be submitted to the United States Department of Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c).

NOW THEREFORE, based on the Joint Motion of the Parties for Entry of this Consent Decree, and before taking any testimony and without the adjudication of any issues of fact or law, and with consent of the Parties, it is ADJUDGED, ORDERED, AND DECREED, as follows:

## I. JURISDICTION AND VENUE

1.     This Court has jurisdiction over the Parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Federal Clean Water Act, 33 U.S.C. § 1365(a)(1)(A), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 1367 (supplemental jurisdiction).  Venue is proper in the District of Massachusetts pursuant to Section 505(c)(1) of the Federal Clean Water Act, 33 U.S.C. § 1365(c)(1).

2.     The Complaint alleges facts that, if proven, would constitute good and sufficient grounds for the relief set forth in this Consent Decree.

## II. EFFECTIVE DATE

3.      The effective date of this Consent Decree shall be when the Court enters the

Consent Decree on the docket ("Effective Date").

## III. PARTIES BOUND

4.      This Consent Decree shall constitute a binding agreement between the Parties,

and the Parties consent to its entry as a final judgment by the Court and waives all rights of

appeal upon its entry on the docket.  If the Court declines to enter this Consent Decree on any

ground except one related to form, this Consent Decree is voidable at the option of either of the

Parties within fourteen (14) days of such a decision by the Court.  If, on the other hand, the Court

determines that substantive modifications to this Consent Decree are necessary prior to the

Court's entry of it, the Parties shall enter into good faith negotiations to discuss the

modifications, and this Consent Decree shall be void unless the Parties agree otherwise in

writing within fourteen (14) days of the Court's decision.

5.      The provisions of this Consent Decree shall apply to and bind SMI and any

person or entity acting by, for, or through SMI, including SMI's officers, agents, servants,

employees, and attorneys, and those persons in active concert or participation with SMI who

receive notice of this Consent Decree ("Persons Bound").

6.      SMI shall provide a true copy of this Consent Decree to all Persons Bound

associated with operations at the Site whose duties include compliance with any provision of this

Consent Decree.  SMI shall also provide a copy of this Consent Decree to any entity retained by

it to perform work required under Section V of this Consent Decree (Injunctive Relief) and shall

condition any such contract, entered into after the Effective Date of the Consent Decree, on the

contractor's performance of such work in compliance with the terms of this Consent Decree.  For

any such contract entered into prior to the Effective Date, SMI shall ensure that the contractor performs such work in compliance with the terms of this Consent Decree.

7.     During the Term of this Consent Decree, SMI shall provide written notice of any change or transfer in ownership of the Site or Wastewater Facility together with a document executed by both SMI and the new owner acknowledging the transfer of obligations relative to the Site and/or Wastewater Facility, as applicable, to the Attorney General in accordance with Section XI (Notices) of this Consent Decree.  At least thirty (30) days prior to any such change or transfer of ownership or operation of the Site or Wastewater Facility, SMI shall provide a copy of this Consent Decree to the proposed transferee.  No change or transfer in ownership or operation of the Wastewater Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve SMI or any Persons Bound of any obligation under this Consent Decree, unless:

     a.     the transferee agrees, in writing, to undertake any outstanding obligations required by Section IV (Payments), Section V (Injunctive Relief), and Section VI (Facility Access and Submission of Records) and substituted for SMI pursuant to Section XIII (Modification) as the Defendant under this Consent Decree and thus assumes the obligations, rights, and benefits of, and be bound by, its terms; and

     b.     the Commonwealth agrees, in writing, to relieve SMI and Persons Bound of their obligations under the Consent Decree.  The Commonwealth shall not unreasonably withhold such written agreement.

Any change or transfer of ownership or operation of the Wastewater Facility without complying with this Paragraph shall constitute a violation of this Consent Decree.

8.  SMI shall not violate this Consent Decree, and SMI shall not allow any Persons Bound to violate this Consent Decree. In any action to enforce this Consent Decree, SMI shall not raise as a defense to liability for violations of this Consent Decree the failure by any Persons Bound to take any actions necessary to comply with the provisions of this Consent Decree.

9.  In addition to any relief specifically provided in this Consent Decree, violations of this Consent Decree by SMI may be punishable by contempt pursuant to an appropriate civil contempt proceeding.

## IV. PAYMENTS

10. Within fifteen (15) days of the Effective Date, SMI shall pay to the Hoosic River Watershed Association the sum of fifty-thousand dollars ($50,000) for projects to benefit water quality through the planting of native species to reduce stormwater impacts and/or through other projects to benefit the Hoosic River watershed. Evidence of SMI's payment to Hoosic River Watershed Association shall be contemporaneously provided by SMI to the Commonwealth pursuant to Section XI (Notices). Payments shall be made by wire transfer referencing this action to the following account:

Hoosic River Watershed Association
ABA#:
ACCOUNT#:



TIN:
Reference: EPD, Commonwealth v. SMI – Payment

11. Within fifteen (15) days of the Effective Date, SMI shall pay to Hoosic River Revival the sum of fifty-thousand dollars ($50,000) for projects to benefit water quality through stormwater management measures in the Hoosic River watershed. Evidence of SMI's payment to Hoosic River Revival shall be contemporaneously provided by SMI to the Commonwealth

pursuant to Section XI (Notices).  Payments shall be made by wire transfer referencing this action to the following account:

> Hoosic River Revival Inc.
> ABA#: 
> ACCOUNT#:
>
> TIN:
> Reference: EPD, Commonwealth v. SMI – Payment

12.　　Within fifteen (15) days of the Effective Date, SMI shall pay to Sonrisas the sum of fifty-thousand dollars ($50,000) for projects to benefit water quality in the Hoosic River watershed through the planting of native species and removal of invasive plant species to reduce stormwater impacts in and around the headwaters of the Hoosic River.  Evidence of SMI's payment to Sonrisas shall be contemporaneously provided by SMI to the Commonwealth pursuant to Section XI (Notices).  Payments shall be made by wire transfer referencing this action to the following account:

> Sonrisas
> ABA#: 
> ACCOUNT#:
>
> TIN:
> Reference: EPD, Commonwealth v. SMI – Payment

13.　　Within fifteen (15) days of the Effective Date, SMI shall pay to the Town of Adams the sum of fifty-thousand dollars ($50,000) for projects to benefit water quality in the Hoosic River watershed through infrastructure improvements in tributaries of the Hoosic River in Adams, Massachusetts.  Evidence of SMI's payment to the Town of Adams shall be

contemporaneously provided by SMI to the Commonwealth pursuant to Section XI (Notices).

Payments shall be made by wire transfer referencing this action to the following account:



Town of Adams
ABA#:
ACCOUNT#:

TIN:
Reference: EPD, Commonwealth v. SMI – Payment

14.     Within fifteen (15) days of the Effective Date, SMI shall pay to the

Commonwealth's Natural Heritage and Endangered Species Fund, established pursuant to G.L.

c. 10, § 35D, civil assessments in the amount of thirty thousand dollars ($30,000.00), pursuant to

G.L. c. 131A, § 6. Evidence of SMI's payment to the Natural Heritage and Endangered Species

Fund shall be contemporaneously provided by SMI to the Commonwealth pursuant to Section XI

(Notices). Payments shall be made by wire transfer referencing this action to the following

account:

Commonwealth of Massachusetts, Division of Fisheries and Wildlife
ABA#:
ACCOUNT#:

TIN:
Reference: EPD, Commonwealth v. SMI – Civil Assessments to Natural Heritage &
Endangered Species Fund

15.     Within fifteen (15) days of the Effective Date, SMI shall pay to the

Commonwealth civil penalties in the amount of twenty thousand dollars ($20,000.00), pursuant

to G.L. c. 131, § 40, and G.L. c. 21, § 42. Evidence of SMI's payment to the Commonwealth

along with SMI's Taxpayer Identification Number and the payment information described in this

Paragraph shall be contemporaneously provided by SMI to the Commonwealth pursuant to

Section XI (Notices). Payments shall be made by wire transfer referencing this action to the following account:

> Commonwealth of Massachusetts, Office of Attorney General
> ABA#: 
> ACCOUNT#:
>
> TIN:
> Reference: EPD, Commonwealth v. SMI – Civil Penalties to General Fund

16.     Within seven (7) days of the Effective Date, SMI shall reimburse the AGO in the amount of forty-nine thousand dollars ($49,000.00) to defray the AGO's costs, including attorneys' fees, incurred in connection with its work on this matter. Evidence of SMI's payment to the Commonwealth along with SMI's Taxpayer Identification Number and the payment information described in this Paragraph shall be contemporaneously provided by SMI to the Commonwealth pursuant to Section XI (Notices). Payments shall be made by wire transfer referencing this action to the following account:

> Commonwealth of Massachusetts, Office of Attorney General
> ABA#: 
> ACCOUNT#:
>
> TIN:
> Reference: EPD, Commonwealth v. SMI – Costs

## V. INJUNCTIVE RELIEF

17.     SMI shall operate the Wastewater Facility in compliance with the requirements of the Stormwater Permit and the NDPES Permit, including any amendments thereto or reissuances of the Stormwater Permit or NPDES Permit, and with applicable federal and state law, including

but not limited to the Federal Clean Water Act, the Massachusetts CWA, the WPA, and MESA, and their implementing regulations.

18. In addition to compliance with requirements of the Stormwater Permit and NPDES Permit, any amendments thereto, and applicable federal and state law, SMI shall undertake certain actions related to the Wastewater Facility and its operations, in accordance with the provisions of Paragraphs 19 - 23, herein, and shall remove certain settled solids from the Discharge Channel, as defined in the Scope of Work in Exhibit C, in accordance with Paragraphs 24 - 25.

*Isolation Valve*

19. Within one hundred and eighty (180) days of the Effective Date, SMI shall install an isolation valve between Pond 2 and Pond 3, as depicted in Exhibit A, at the Wastewater Facility, in accordance with the plans attached hereto as Exhibit B ("Isolation Valve") to enable SMI to restrict the flow of process wastewater from discharging from the Wastewater Facility to the Hoosic River, as necessary and appropriate for compliance with the NPDES Permit.

*Continuous Monitoring at the Isolation Valve*

20. Within sixty (60) days of the Effective Date, SMI shall submit to DEP, for review and approval, with a copy to the AGO and DFW, a plan for continuous monitoring of pH and turbidity with a Supervisory Control and Data Acquisition ("SCADA") monitoring system and alarms at the Isolation Valve installed pursuant to Paragraph 19 ("Continuous Monitoring Plan"). The Continuous Monitoring Plan shall include the following:

    a. For pH:

        i. a first alarm upon indication of pH 7.8 for thirty (30) minutes or more at the neutralizer, which shall require SMI to undertake one or more of the

following operational protocols: (a) immediately increasing the volume of neutralizing agent in the neutralizer; (b) in-person observation of Ponds 1D, 1B, 2, and 3; (c) cessation of all pond cleaning activities; (d) monitoring of pH levels at the Recycling Line and Isolation Valve; (e) manual evaluation of the calibration of pH meters at the neutralizer, Isolation Valve, and Recycling Line; and (f) evaluation of change in conditions over time.

ii.  a second alarm upon indication of pH 8.1 for thirty (30) minutes or more at the Isolation Valve, which shall require SMI to notify a certified wastewater operator and Environmental Health and Safety ("EH&S") personnel.  Within sixty (60) minutes of a second alarm, either (1) a certified wastewater operator shall conduct manual pH measurements at Outfalls 001A and 001 and the Isolation Valve, as depicted in Exhibit A, and shall follow Standard Operating Procedures to shut the Isolation Valve or cease quarry pumping, and continue monitoring, or (2) SMI shall close the Isolation Valve.  If the Isolation Valve is closed and pH measurements at the neutralizer or Outfalls 001A or 001 remain above 8.1 for thirty (30) minutes or more following such closure, SMI shall restrict or commence shutting down its manufacturing process.

iii.  a third alarm upon indication of pH 8.3 at the Isolation Valve for thirty (30) minutes or more, which shall require SMI to close the Isolation Valve and restrict or commence shutting down its manufacturing processes.

      iv.  Under subsections (ii) and (iii) above, shut down of SMI's manufacturing process shall be completed within approximately 8 hours.

b.  For turbidity, SMI shall provide for:

      i.  A first alarm upon indication of forty (40) Nephelometric Turbidity Units ("NTU") at the Isolation Valve for thirty (30) minutes or more, which shall require SMI to undertake one or more of the following protocols: (a) in-person observation of Ponds 1D, 1B, 2, and 3; (b) ceasing any pond-cleaning activities; (c) manual measurement of turbidity at the Isolation Valve and Outfall 001A; or (d) in-person observation of Outfall 001.

      ii.  an automatic shutoff valve alarm upon indication of sixty (60) NTU at the Isolation Valve for, with increasing concentration over, thirty (30) minutes or more, which shall require SMI to close the Isolation Valve. SMI shall sample for Turbidity in Pond 2 thirty (30) minutes after the Isolation Valve is closed and shall restrict or commence shutting down its manufacturing processes if turbidity remains at or above sixty (60) NTU.

c.  For color, SMI shall, within thirty (30) days of the Effective Date, submit to DEP and DFW, for review and approval, with a copy to the AGO, a plan for the installation of a camera at the monitoring location at Outfall 001 and subsequent daily monitoring of the camera to ensure that the effluent from the Wastewater Facility does not cause objectionable discoloration of the receiving waters. Such plan shall include the requirement that SMI install a camera proximate to the monitoring location at Outfall 001 to capture a still image of the effluent from the Wastewater Facility as it approaches that location. As part of the installation of

such camera, SMI may install an appropriate metallic or dark material in or behind the water column to assist with obtaining representative photographs. The location and angle of the camera shall be set to reasonably avoid impacts from shading and other environmental factors on the photographs. A member of SMI staff shall timely review the photograph each day to (i) confirm a photograph was taken, (ii) confirm that the photograph reflects conditions consistent with the NPDES Permit, and (iii) document in writing that (i) and (ii) have been completed, as well as any other relevant information. If SMI believes the photograph is compromised and does not accurately capture the condition of the water column, SMI may take another photograph with the camera or have a member of SMI staff manually take a photograph from the same location on the same day. SMI may make contemporaneous notes to accompany each photograph. SMI shall retain such photographs and relevant information and notes electronically for one thousand ninety-five (1,095) days from the date the first photograph is taken and shall make such photographs available to the AGO, DEP, and DFW upon written request.

d. All sampling conducted pursuant to this Paragraph shall be conducted in compliance with methods of analysis under 40 C.F.R. Part 136.

e. All data collected from continuous-monitoring devices and associated alarm notifications shall be sent to and processed by SMI's certified wastewater operator or qualified personnel or third parties under supervision of a certified wastewater operator. SMI shall maintain all such data and information at the Wastewater Facility for one thousand ninety-five (1,095) days from the date the

data and information is generated and shall make such data and information available to the AGO, DEP, and DFW upon written request.

f. The provisions of this Paragraph do not affect SMI's obligation to comply with the water quality requirements of the NPDES Permit, and any amendments thereto, including the requirement that effluent from the Wastewater Facility shall not cause objectionable discoloration in the receiving waters.

21. SMI shall begin the continuous monitoring pursuant to the Continuous Monitoring Plan upon the later of: thirty (30) days after completion of installation of the Isolation Valve; or within ninety (90) days of DEP's approval, pursuant to Paragraph 20, of the Continuous Monitoring Plan. SMI shall only cease continuous monitoring pursuant to the terms of this Consent Decree if:

a. necessary for the repair or maintenance of equipment necessary to conduct continuous monitoring pursuant to the Continuous Monitoring Plan;

b. the Wastewater Facility ceases the discharge of wastewater to surface water;

c. the NPDES Permit or applicable state or federal law or regulations are amended to require continuous monitoring, alarms, and response protocols that are, as confirmed by DEP in writing, either substantially equivalent to or more stringent than the continuous monitoring, alarms, and response protocols set forth in this Section (Injunctive Relief);

d. performance of continuous-monitoring obligations pursuant to the Continuous Monitoring Plan is prevented or delayed solely by circumstances that constitute a force majeure event, as defined in Section VII (Dispute Resolution and Force Majeure); or

e.  the Term (as defined in Section XV (Term and Retention of Jurisdiction)) has ended.

*Operation and Maintenance Manual*

22.  Within ninety (90) days of DEP's approval, pursuant to Paragraph 20, of the Continuous Monitoring Plan, SMI shall submit to DEP, for review and approval, with a copy to the AGO, an updated Operation and Maintenance ("O&M") Manual compliant with 314 C.M.R. §§ 12.00 *et seq.,* including, but not limited to:

a.  The operation and response protocols for the Isolation Valve and continuous monitoring as provided in Paragraphs 19 - 21, herein;

b.  a Wastewater Facility staffing plan compliant with 314 C.M.R. §§ 12.00 *et seq.* and 257 C.M.R. §§ 2.00 *et seq.*, including a staffing analysis describing all alarming and response protocols, that provides for staff coverage by appropriate number and grades of wastewater treatment plant operators during all times of operation including, as applicable, a Chief Operator, Assistant Chief Operator, shift operator(s), and weekend operator(s);

c.  a plan for training all of the Wastewater Facility's wastewater treatment operating personnel and ensuring all successive operating personnel are trained and competent to operate the Wastewater Facility in accordance with 314 C.M.R. §§ 12.00 *et seq.* and 257 C.M.R. §§ 2.00 *et seq.*;

d.  response protocols for any bypass of or breach at the Wastewater Facility or any unpermitted or noncompliant releases to surface water; and

e.  protocols and procedures for cleaning the impoundments/ponds at the Wastewater Facility and removing, dewatering, and transporting solids from the

Wastewater Facility to SMI's DEP-permitted landfill or other authorized location to prevent unpermitted or other noncompliant discharges to surface water directly or through any stormwater collection system at the Site.

During the Term of this Consent Decree, SMI may submit to DEP, for review and approval, with a copy to the AGO, any necessary or appropriate modifications to this O&M Manual.

23.     Within ninety (90) days of the Effective Date, SMI shall submit to DEP, for review and approval, with a copy to the AGO, a plan and schedule for inspecting all manufacturing process equipment and infrastructures (i.e., conduits, pipes, valves, pumps, tanks, and monitoring and alarm equipment) that convey wastewater to and within the Wastewater Facility or to any location(s) outside of the Site.  Such plan shall include, but shall not be limited to, an inspection schedule, procedures for documenting and reporting problem(s) observed as required by law, a schedule and timeline for taking corrective actions to correct the problem(s), and chain of staff responsibility for implementing the plan.

*Discharge Channel Sediment Removal*

24.     Within three hundred and sixty-five (365) days of the Effective Date, SMI shall remove certain settled solids from the Discharge Channel in accordance with the Scope of Work in Exhibit C, which has been reviewed and approved by DEP and DFW and is attached hereto as Exhibit C and incorporated into this Consent Decree by reference.

25.     Any modification to the Channel Sediment Removal Scope of Work in Exhibit C shall require written approval by DEP and DFW, but shall not constitute a material change to this Consent Decree for purposes of Section XIII (Modification).

## VI. FACILITY ACCESS AND SUBMISSION OF RECORDS

26.     SMI shall permit the AGO, DEP, and DFW to visit the Wastewater Facility during normal daylight business hours during the Term of this Consent Decree, provided that the AGO, DEP, and DFW provide at least twenty-four (24) hours of prior written notice.  During any such Wastewater Facility visit, the AGO, DEP, and DFW shall have access to and permission to copy any documentation required to be maintained pursuant to the Stormwater Permit, the NPDES Permit, or this Consent Decree and may collect stormwater and wastewater samples and take photographs at the Wastewater Facility, provided SMI has the opportunity to collect duplicate samples and/or take duplicate photographs, if present.  Upon SMI's written request, the AGO, DEP, and/or DFW will make available to SMI the results of any sampling, along with all customary data and QA/QC information, and any photographs taken during such visits.  All documentation collected or photographs taken during such visits shall be governed by 310 C.M.R. § 3.00 and other applicable law, including G.L. c. 66.

27.     For a period of seven hundred thirty (730) days following the Effective Date, SMI shall provide the AGO with the following documents in accordance with Section XI (Notices), below, within ten (10) business days of SMI's receipt of a written request by the AGO for such documents:

> a.      all documents SMI has submitted to EPA, an agency of the Commonwealth, and/or the Town of Adams concerning SMI's stormwater controls or the quality of SMI's Stormwater Discharges Associated with Industrial Activity since sixty (60) days before the Effective Date, including but not limited to all documents and reports submitted as required by the Stormwater Permit;

18

b. all documents and communications SMI has submitted to EPA concerning Corrective Action or Additional Implementation Measures taken at the Wastewater Facility since sixty (60) days before the Effective Date;

c. all maintenance records for the Wastewater Facility's stormwater pollution control systems created since sixty (60) days before the Effective Date;

d. all written material, including presentations, associated with any trainings referenced in SMI's Stormwater Pollution Prevention Plan ("SWPPP") and conducted since sixty (60) days before the Effective Date;

e. written notice of any changes made since sixty (60) days before the Effective Date to any of SMI's stormwater control measures that are described in the SWPPP pursuant to Stormwater Permit Section 6.2.4;

f. written notice of any changes made since sixty (60) days before the Effective Date to SMI's stormwater control measures pursuant to Stormwater Permit Section 6.3;

g. a copy of SMI's then-applicable and effective SWPPP; and

h. all Discharge Monitoring Reports, as well as supporting laboratory reports and analytical results of sampling performed by or for SMI since sixty (60) days before the Effective Date and pursuant to the Stormwater Permit.

28. Any information provided or made available by SMI to the AGO, DEP, or DFW under the terms of this Consent Decree may be used by the Commonwealth in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

29. This Consent Decree in no way limits or affects any right of entry and inspection or any right to obtain information held by the Commonwealth or any of its branches,

departments, agencies, or offices pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of SMI to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## VII. DISPUTE RESOLUTION AND FORCE MAJEURE

30.    Unless otherwise provided in this Consent Decree, the Dispute Resolution procedures in this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  These procedures, however, shall not apply to actions by the Commonwealth to enforce obligations of SMI that have not been disputed in accordance with this Section.  In the event that SMI utilizes the procedures in this Section for a dispute arising under Section IV of this Consent Decree (Payments), then all references to DEP and DFW (together, the Agencies) in this Section shall include the Commonwealth.

31.    If SMI disagrees with a written determination of the Commonwealth that SMI has failed to comply with one or more terms of this Consent Decree, then SMI may, within thirty (30) days of the date of the Commonwealth's determination, request reconsideration of the determination by submitting to the Agencies, with a copy to the AGO, any information or material it believes demonstrates that the Agencies' determination was erroneous.  SMI's failure to submit a request for reconsideration within the period specified in this Paragraph shall constitute a waiver of SMI's ability to seek reconsideration and, in that case, the Agencies' determination shall be final and unreviewable.  If, after consideration of a timely request for reconsideration, the Agencies decide to affirm, in whole or in part, the Agencies' original determination, then the Agencies shall notify SMI of their determination on reconsideration.

32.    The Agencies' determination on reconsideration shall be final unless SMI seeks judicial review of the dispute by filing with the Court and serving on the Commonwealth, in

accordance with Section XI of this Consent Judgment (Notices), a motion in this case requesting judicial resolution of the dispute within fourteen (14) days of receipt of the Agencies' determination. In an action for judicial review under this Section, SMI shall bear the burden of demonstrating that the Agencies' determination on reconsideration was arbitrary and capricious or otherwise not in accordance with law. SMI's motion and supporting memorandum shall not raise any new issues or be based on new facts or information that SMI did not present previously to the Agencies during the dispute resolution process described in this Section.

33. SMI shall perform the actions required by Section V of this Consent Judgment (Injunctive Relief) within the time limits established in those Sections, unless the performance is prevented or delayed solely by events that constitute a force majeure event. A force majeure event is an event that arises from causes entirely beyond SMI's control that will delay or prevent the performance of any action required by Sections V (Injunctive Relief) despite SMI's due diligence. A force majeure event does not include, among other things, unanticipated or increased costs of performance, changed economic circumstances, or a financial inability to perform. Except as excused by the Agencies pursuant to this Section, delay on the part of SMI's contractors, subcontractors, or consultants shall be attributable to SMI.

34. Any request to extend a deadline set forth in Section V of this Consent Judgment (Injunctive Relief), including a deadline in a plan submitted to the Agencies by SMI pursuant to that Section, due to a force majeure event or otherwise, shall be made in writing to the Agencies, with a copy to the AGO, prior to the expiration of the deadline. In its written request to the Agencies, SMI shall describe (a) what action has been affected, (b) the anticipated length of delay, (c) the cause of the delay, and (d) the steps or measures it will take to prevent or minimize the delay. Upon receipt of a timely request for an extension under this Section, the Agencies

may, in their discretion, grant additional time if they are persuaded that the delay in performance is the result of a force majeure event or otherwise determine an extension of the deadline is appropriate. The Agencies shall not unreasonably withhold or condition an extension, but if the Agencies do not agree that a force majeure event has occurred or do not agree to the length of the extension of time sought by SMI or that an extension of the deadline is otherwise appropriate and that disagreement cannot be resolved by informal negotiation, then the Agencies will notify SMI in writing of the Agencies' position, which shall be binding unless, within seven (7) days after receipt of the Agencies' written notice, SMI invokes the Dispute Resolution procedures set forth in this Section. In any such proceedings under this Section, SMI shall bear the burden of demonstrating, by a preponderance of the evidence, that (a) SMI provided the written request required above, (b) the delay in performance is the result of circumstances entirely beyond SMI's control, and (c) SMI could not have prevented or avoided the delay by the reasonable exercise of due care, foresight, or due diligence. SMI's failure to comply with the notice requirements of this Paragraph shall constitute a waiver of its right to request an extension of time with regard to any delay, and a waiver of any right to relief from the deadlines in Section V (Injunctive Relief) or any plan submitted to and approved by the Agencies pursuant to that Section V.

## VIII.  INTEREST AND COLLECTIONS

35.      If any payment required pursuant to this Consent Decree is late or not made, SMI shall pay interest on any overdue amount for the period of such nonpayment at the rate specified in 28 U.S.C. § 1961 and shall pay all reasonable expenses associated with collection by the Commonwealth of the unpaid amounts and interest for any period of nonpayment after the payment obligation becomes due, including reasonable attorney fees and costs.

## IX. EFFECT OF CONSENT DECREE

36.     Upon compliance by SMI with the requirements of this Consent Decree, (a) this Consent Decree shall fully resolve SMI's liability for the specific facts and legal claims alleged against it in the Notice and Complaint (the "Resolved Claims"), and (b) the Commonwealth shall fully release SMI from liability for the specific facts and legal claims alleged against it in the Notice and Complaint.  Notwithstanding the foregoing, the Commonwealth expressly reserves all claims for injunctive relief for violations of all the statutes and regulations referred to in this Consent Decree, whether related to the Resolved Claims or otherwise.

37.     Nothing in this Consent Decree (a) shall bar any action by the Commonwealth on any legal claim not specifically pleaded in the Complaint or for any violations not revealed to the Commonwealth; (b) shall be deemed to excuse non-compliance by SMI, or any of the persons or entities otherwise bound by this Consent Decree with any law or regulation; or (c) shall preclude a separate or ancillary action by the Commonwealth to enforce the terms of this Consent Decree or any permit or other approval issued by DEP, DFW, or EPA relative to the Wastewater Facility.

38.     Notwithstanding Paragraph 37, except to the extent the Commonwealth has requested and the Court has ordered under this Consent Decree SMI to undertake and complete the activities approved pursuant to Paragraphs 17 - 27, herein, and in the Scope of Work in Exhibit C, (i) this Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations; (ii) SMI is responsible for achieving and maintaining compliance with all applicable federal, state, and local laws, regulations, and permits; (iii) SMI's compliance with this Consent Decree shall not be a defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein; and (iv) the AGO does not,

by its consent to the entry of this Consent Decree, warrant or aver in any manner that SMI's compliance with any aspect of this Consent Decree will result in compliance with provisions of any federal, state, or local law, regulation, or permit. For further clarity, the Commonwealth has required and the Court has ordered under this Consent Decree SMI to undertake and complete the activities approved pursuant to Paragraphs 17 - 27, herein, and in the Scope of Work without further approvals by the Commonwealth under the laws and regulations identified in the Notice and Complaint, except as detailed herein.

39.     Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a party to this Consent Decree.

## X. MISCELLANEOUS

40.     SMI understands and agrees that, pursuant to 11 U.S.C. § 523(a)(7), the costs or sums that SMI may be required to pay under this Consent Decree are not subject to discharge in any bankruptcy.

41.     SMI shall pay all expenses, including reasonable attorney fees and costs, incurred by the Commonwealth in the enforcement of this Consent Decree consistent with the scope of 33 U.S.C. § 1365(d).

42.     Nothing in this Consent Decree shall prevent SMI from taking any action otherwise required by law.

43.     The titles in this Consent Decree have no independent legal significance and are used merely for the convenience of the Parties.

44.     In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or State or Federal holiday, the period shall run until the close of business on the next business day.

45.     SMI is responsible for complying with this Consent Decree and is liable for violations of this Consent Decree.

46.     Signatures of the Parties transmitted by scanning and email are binding.

## XI. NOTICES

47.     Unless otherwise specified in this Consent Decree, notices and submissions required by this Decree shall be made in writing by email to the following addresses:

> For the AGO and the Commonwealth:
>
> Turner H. Smith, Julia Jonas-Day, & Emily Field
> Energy & Environment Bureau
> Office of the Attorney General
> One Ashburton Place, 18th Floor
> Boston, MA 02108
> Turner.Smith@mass.gov
> Julia.Jonas-Day@mass.gov
> Emily.Field@mass.gov
>
> For DEP:
>
> Michael Gorski, Regional Director
> Massachusetts Department of Environmental Protection
> Western Regional Office
> 436 Dwight Street
> Springfield, MA  01031
> Michael.Gorski@mass.gov
>
> For DFW:
>
> Jesse Leddick, Assistant Director
> Natural Heritage & Endangered Species Program
> Division of Fisheries and Wildlife
> One Rabbit Hill Road
> Westborough, MA 01581
> Jesse.Leddick@mass.gov
>
> For SMI:
>
> Joseph Meadows, Segment Counsel
> Specialty Minerals Inc.
> 1 Highland Avenue

Bethlehem, PA 18017
joseph.meadows@Mineralstech.com

Earl W. Phillips, Jr.
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
ephillips@rc.com

Jonathan H. Schaefer
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
jschaefer@rc.com

or, to such other place or to the attention of such other individual as a party may from time to time designate by written notice to the other party to this Consent Decree.

## XII. INTEGRATION

48.     Except as expressly set forth in this Consent Decree, this Consent Decree, its Exhibits, and approvals issued hereunder set forth all of the obligations of the Parties and represents the complete and exclusive statement of the Parties with respect to the terms of the settled agreement embodied by this Consent Decree; any other representations, communications, or agreements by or between Parties shall have no force and effect.

## XIII. MODIFICATION

49.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only by written approval of the Parties and the approval of the Court.  The Commonwealth's decision to extend a deadline in this Consent Decree shall not constitute a material change for purposes of this Paragraph.  Minor modifications of the approved or preliminary plans, Scope of Work, manual or schedule attached hereto shall not constitute a material change for purposes of this Paragraph.

## XIV. AUTHORITY OF SIGNATORY

50.     The person signing this Consent Decree on behalf of SMI acknowledges: (a) that they have personally read and understand each of the numbered Paragraphs of this Consent Decree, including any Exhibits attached to it; (b) that they are authorized to sign and bind SMI to the terms of this Consent Decree, and (c) that, to the extent necessary, SMI's managers, directors, officers, and shareholders have consented to SMI entering this Consent Decree and to its entry as a Final Judgment.

## XV. TERM AND RETENTION OF JURISDICTION

51.     The term of this Consent Decree ("Term") shall be from the Effective Date until the earlier of one thousand ninety-six (1,096) days after the Effective Date or the date on which SMI has ceased operating in accordance with state and federal laws, including 314 C.M.R. §§ 12.00.  During the Term, the Court shall retain jurisdiction over this case for purposes of resolving disputes that arise under this Consent Decree, entering orders modifying this Consent Decree, or effectuating or enforcing compliance with the terms of this Consent Decree.

## XVI. FINAL JUDGMENT

52. Upon approval and entry of this Consent Decree by the Court, this Consent

Decree shall constitute a Final Judgment of the Court.

OFFICE OF THE ATTORNEY GENERAL
ANDREA JOY CAMPBELL, ATTORNEY GENERAL


By: _____ Date: ___April 30, 2024___
Turner H. Smith (BBO # 684750)
Assistant Attorney General
Deputy Bureau Chief
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
617-963-2207
Turner.Smith@mass.gov


SPECIALTY MINERALS INC.

By: _____ Date: __April 29, 2024__
Daniel Joseph Monagle III
Group President, Consumer & Specialties




IT IS SO ORDERED. JUDGMENT is hereby entered in accordance with the foregoing.

By the Court:

_____

United States District Court

Dated: _____

**EXHIBIT A**



**PROCESS PLANT**

**PROCESS WASTEWATER COLLECTION BASIN**

**POND # 1A NON-PROCESS WATER**

**POND # 1C NON-PROCESS WATER**

**POND # 1D PROCESS WASTE WATER**

**POND # 1B PROCESS WASTE WATER**

**POLYMER BUILDING**

**EFFLUENT FINISHING POND RECYCLING LINE WITHDRAW LOCATION (pH MONITORING AT KILN SCRUBBER)**

**CONTINUOUS MONITORING LOCATION**

**ISOLATION VALVE**

**NEUTRALIZATION BASIN**

**POND # 2 EFFLUENT FINISHING POND**

**POND # 3 EFFLUENT POLISHING POND**

**NPDES OUTFALL 001A MONITORING LOCATION**

**NPDES OUTFALL 001 MONITORING LOCATION**

ROUTE # (COLUMBIA STREET)

LIME STREET

HOOSIC RIVER

NOTES:

1. THE BASE MAP WAS DRAWN FROM A PLAN ENTITLED, "PLAN OF LAND", PREPARED BY HILL ENGINEERS, ARCHITECTS, PLANNERS OF DALTON, MA, DATED OCTOBER 21, 2006. REVISED JANUARY 1, 2001, AUGUST 20, 2009, OCTOBER 5, 2009 AND ADDITIONAL FLAGGING DATA PROVIED ON MAY 27, 2010 WITH AN ORIGINAL SCALE OF 1" = 40'.

2. AERIAL PHOTOGRAPHY PROVIDED BY ESRI THROUGH ARCGIS ONLINE.

LEGEND:

| | |
|---|---|
| ———— | PROPERTY LINE |
| – – – – | ABUTTING PROPERTY LINE |
| ———— | 1-FOOT ELEVATION CONTOUR |
| ———— | 5-FOOT ELEVATION CONTOUR |
| ———— | EDGE OF PAVEMENT |
| – – – – | EDGE OF RIVER |
| ══════ | RAILROAD TRACKS |
| ———— | BUILDING |

**SANBORN ❘❘❘ HEAD**

GRAPHICAL SCALE

80'  40'  0'  80'  160'

DRAWN BY: D. DOMBROWSKY
DESIGNED BY: R. ABELL
REVIEWED BY: R. ABELL
PROJECT MGR: M. HEIL
PIC: M. HEIL
DATE: MARCH 2024

ENGINEERING REPORT/GROUNDWATER DISCHARGE PERMIT

**SPECIALTY MINERALS, INC**

ADAMS, MASSACHUSETTS

**ATTACHMENT A**

PROJECT NUMBER: 1631.32

SHEET NUMBER: 1

NO. | DATE | DESCRIPTION | BY

# EXHIBIT B



Mr. Kyle Ledbetter
Specialty Minerals Inc.
260 Columbia Street
Adams, Massachusetts 01220

April 29, 2024
File No. 1631.33

Re:     Design Review and Engineer's Certification
        Proposed Wastewater Treatment Pond Isolation Valve Design
        260 Columbia Street
        Specialty Minerals, Inc.
        Adams, Massachusetts

Dear Mr. Ledbetter:

As requested on behalf of Specialty Minerals, Inc. (SMI), Sanborn Head & Associates, Inc. (Sanborn Head) has reviewed the Engineering Report for the Adams Wastewater Isolation Valve prepared by SMI, dated March 24, 2024, including the plans prepared by Industrial Process Design (IPD) of Slingerlands, New York titled SMI Adams, MA Plant – WTP Pond Isolation Project, Civil/Mechanical Drawing Set, IPDI Project Number 2023-047, Construction Documents, DWG # 2023-047-T1 and 2023-047-C1 to C5, C1 Revisions, dated April 26, 2024.  We understand that the addition of an isolation valve to SMI's existing wastewater treatment facility between Ponds 2 and 3 was agreed upon by SMI and the Massachusetts Attorney General's Office (on behalf of the Massachusetts Department of Environmental Protection (MassDEP)) to enable SMI to restrict the flow of process wastewater from discharging from the wastewater treatment facility to the Hoosic River, as necessary and appropriate for compliance with SMI's NPDES Permit.

Based on our review of the design, we have also provided an Engineer's Certification Statement form, which we understand is required to support the formal submittal and approval of the new valve by the MassDEP.  Should you have any questions, please do not hesitate to call.

Very truly yours,
SANBORN, HEAD & ASSOCIATES, INC.



Matthew P. Heil, PE (MA Civil Engineer #41019), LSP
*Vice President*

Encl.    Certification Statement Form

P:\1600s\1631.33\Source Files\Isolation Valve Design Review\20240429 SMI Isolation Valve Design Review and Eng Cert.docx

Sanborn, Head & Associates, Inc.          sanbornhead.com



**Massachusetts Department of Environmental Protection**
Bureau of Water Resources – Groundwater Discharge, Surface Water Discharge,
Reclaimed Water Use and Watershed Permits

# Certification Statement

For WP 11, 68, 79, 80, 81, 84, 85, 86, 87, 88, 89, 90, 95, 96, 97, 98 and WM 16

## A. Engineer Information

**Important:** When filling out forms on the computer, use only the tab key to move your cursor - do not use the return key.

Matthew P. Heil
_____
Engineer Name

Sanborn, Head & Associates, Inc.
_____
Company

6 Bedford Farms Drive, Suite 201                          Bedford
_____          _____
Street Address                                           City

New Hampshire          03110               978-577-1021        mheil@sanbornhead.com
_____   _____   _____   _____
State              Zip Code         Telephone          Email Address

## B. Certification

I,    Matthew P. Heil
_____
Name

attest under the pains and penalties of perjury:

(i)  that I am a registered professional engineer in the State of Massachusetts, with a concentration in sanitary, civil, or environmental engineering, and am employed by

Sanborn, Head & Associates, Inc.
_____
Name of Company/Firm

(ii)  that  ☐ the Engineering Report
           ☑ the Plans and Specifications

SMI Adams, MA Plant - WTP Pond Isolation Project Civil/Mechanical Drawing Set, IPDI Project #2023-047 Construction Documents, DWG # 2023-047-T1 and 2023-047-C1 to C5, dated April 26, 2024
_____
Name of Facility

have been prepared in accordance with modern sanitary engineering practice and all applicable federal, state, and local laws, regulations, and standards, except where otherwise approved by the Department, including, but not limited to the current editions of TR-16 (Guides For The Design Of Wastewater Treatment Works), the Massachusetts Guidelines for the Design, Construction, Operation and Maintenance of Small Wastewater Treatment Facilities with Land Disposal, and the Massachusetts State Building Code; and

that the facility, as designed, is capable of meeting the required effluent standards described in the Engineering Report included as part of this permit application.

(iii)  ☐  that the Hydrogeological Evaluation prepared for this project and approved by MassDEP on

_____          for     _____
Date                                                     Name of Facility

is consistent with the site conditions and design parameters for this facility, including, but not limited to: design flow, site design, hydraulic loading rate, and location of public and private potable water supply wells, and potential impacts of the proposed facility to nearby sensitive receptors and/or property.

I am aware that there are significant penalties including, but not limited to possible fines and imprisonment for willfully submitting false, inaccurate, misleading or incomplete information.  I am also aware that submitting false, inaccurate misleading or incomplete information could lead to modification, suspension or revocation of any permit granted pursuant to this application.

_____          MA Civil Engineer # 41019
Signature                                                Massachusetts PE Number

Vice President                                           April 29, 2024
_____          _____
Title                                                    Date

# SMI ADAMS, MA PLANT - WTP POND ISOLATION PROJECT

## CIVIL / MECHANICAL DRAWING SET
## IPDI PROJECT NUMBER 2023-047

260 COLUMBIA STREET
ADAMS, MA 01220

## CONSTRUCTION DOCUMENTS

ISSUED FOR REVIEW: 04-26-2024



POND ISOLATION
LOCATION

### LEGEND

| | |
|---|---|
| NORTH ARROW | |
| TIE POINT TAG | TP |
| SECTION MARK | — DETAIL ID / — DWG SET-SHT. # |
| SECTION TITLE | — SECTION ID / — DWG SET-SHT. # |
| DETAIL MARK/TITLE | — DETAIL ID / — DWG SET-SHT. # |

## DRAWING INDEX: CIVIL DRAWINGS

| DRAWING NO. | REVISION | DESCRIPTION |
|---|---|---|
| IPDI #2023-047-T1-01 | C1 | TITLE PAGE |
| IPDI #2023-047-T1-02 | C1 | NOTES |
| IPDI #2023-047-C1-01 | C1 | DEMO - PLAN VIEW |
| IPDI #2023-047-C1-02 | C1 | DEMO - ELEVATION VIEW |
| IPDI #2023-047-C1-03 | C1 | GENERAL ARRANGEMENT PLAN |
| IPDI #2023-047-C1-04 | C1 | DETAILED ELEVATION |
| IPDI #2023-047-C1-05 | C1 | DETAILS |

### WORK DESCRIPTION:

1. SMI IS PROPOSING THE INSTALLATION OF A NEW SS PIPE & ISOLATION VALVE BETWEEN SETTLEMENT PONDS 3 & 4 ON SITE.
2. THE AWARDED CONTRACTOR SHALL BE RESPONSIBLE FOR THE FOLLOWING TASKS.
3. OFFLOAD AND PROVIDE STORAGE OF THE SS PIPE & ISOLATION VALVE UNTIL INSTALLATION.
4. CONTRACTOR SHALL FIELD VERIFY PIPE LENGTH AND PROPOSED LOCATION PRIOR TO ORDERING/FABRICATING MATERIALS.
5. PROVIDE SHORING AND DEWATERING DESIGN FOR THE PIPE INSTALLATION. PONDS SHALL BE DE-WATERED 1 TO 2 FEET BELOW EXISTING PIPE ELEVATIONS.
6. COORDINATE PIPING INSTALLATION, I.E. OVERALL PIPE DEPTH
7. INSTALL STRUCTURAL BACKFILL BELOW PIPING AS NOTED.
8. INSTALL SONOTUBE TO SUPPORT ACTUATOR ACCORDING TO DRAWINGS.
9. INSTALL THE PIPE AND VALVE FOLLOWING ALL MANUFACTURERS RECOMMENDATIONS WHILE CONFORMING TO THE LATEST CERTIFIED VENDOR DRAWING.
10. PROVIDE BACKFILL AROUND PIPE WHEN INSTALLATION IS COMPLETE.
11. TRENCH BACKFILL AND ROAD CONSTRUCTION SHALL MATCH EXISTING ROAD ELEVATION.



BRIAN DAVENPORT No. 58070

UNAUTHORIZED ALTERATION OR ADDITIONS TO A DOCUMENT BEARING THE SEAL OF A LICENSED PROFESSIONAL ENGINEER OR LAND SURVEYOR IS A VIOLATION OF THE CODE OF MASSACHUSETTS REGULATIONS - 250 CMR 5.00 PROFESSIONAL PRACTICE

| C1 | 4/26/2024 | FOR CONSTRUCTION | KTN | LVM | APP'D |
| C0 | 3/21/2024 | FOR CONSTRUCTION | KTN | LVM | APP'D |
| REV | DATE | DESCRIPTION | DRAWN | CHK'D | APP'D |



MINERALS TECHNOLOGIES

**Specialty MINERALS**

SPECIALTY MINERALS
260 COLUMBIA ST.
ADAMS, MA 01220



834 KENWOOD AVENUE
SLINGERLANDS, N.Y. 12159
PHONE: 518-439-6575
FAX: 518-439-6584

Industrial Process Design

DWG #: 2023-047-T1

SHEET: 1 OF 7

DATE: 4/26/2024 | REV: C1

TITLE
SPECIALTY MINERALS WTP POND ISOLATION
GENERAL ARRANGEMENT PLAN
PONDS 3 & 4

NOTES:

1. DRAWINGS ARE TO SCALE ON "D-SIZE" SHEET ONLY (24"x36").
2. CONTRACTOR MUST FIELD VERIFY ALL DIMENSIONS.

## STRUCTURAL STEEL

A. MATERIALS SHALL BE NEW AND FREE FROM RUST. ALL STEEL TO BE PRIMED AND FINISH PAINTED.

B. GENERAL STANDARD: AISC SPECIFICATION FOR THE DESIGN, FABRICATION, AND ERECTION OF STRUCTURAL STEEL FOR BUILDINGS, LATEST EDITION.

C. WELDING STANDARD: AWS STRUCTURAL WELDING CODE - STEEL, LATEST EDITION.

D. STEEL STRUCTURES PAINTING COUNCIL (SSPC), "SURFACE PREPARATION SPECIFICATIONS."

E. ROLLED-STEEL W SHAPES: ASTM A 992.

F. ROLLED STEEL PLATES, BARS AND ANGLES: ASTM A 36.

G. ROLLED STEEL C, MC, S, SHAPES ASTM A36, UNLESS INDICATED AS GRADE 50 (ASTM A 572) ON DRAWINGS.

G1. STEEL PIPE: ASTM A53, TYPE E OR S, GRADE B.

H. HOLLOW STRUCTURAL SECTIONS (HSS) ASTM A 500, GRADE B OR C.

I. ELECTRODES: E70 SERIES, AND IN ACCORDANCE WITH AWS.

J. BOLTS: ASTM A 325 OR A 490, TYPE 1, PLAIN.

K. MINIMUM CAPACITY OF BEAM CONNECTIONS: FOR CONNECTIONS NOT DETAILED, PROVIDE CONNECTION CAPACITY BASED ON ALLOWABLE STRESS DESIGN WITH AT LEAST 50 PERCENT OF THE ALLOWABLE UNIFORM LOAD FROM ALLOWABLE UNIFORM LOAD TABLES IN AISC ASD MANUAL, PART 2, FOR THE GIVEN STEEL MEMBER.

L. PROVIDE BEARING BOLT (N) CONNECTIONS, UNLESS INDICATED OTHERWISE.

M. ONLY USE CONNECTIONS WHICH ARE PUBLISHED BY AISC. DO NOT MODIFY PUBLISHED CONNECTION DETAILS UNLESS ACCEPTED BY ENGINEER. BOLT FIELD CONNECTIONS WHEREVER POSSIBLE.

N. STEEL PRIMER PAINT: SHERWIN WILLIAMS B58W00610 MACROPOXY 646 @ 4 MILS MINIMUM DFT OR APPROVED EQUAL.

O. STEEL INTERMEDIATE COAT: SHERWIN WILLIAMS B58W00610 MACROPOXY 646 @ 4 MILS MINIMUM DFT OR APPROVED EQUAL.

P. STEEL FINISH PAINT: SHERWIN WILLIAMS B65W00651 - ACROLON 218 HS POLYURETHANE - SEMI GLOSS (PART A) EXTRA WHITE @ 4MILS MINIMUM DFT OR APPROVED EQUAL.

Q. FOR STEEL TO BE FINISH PAINTED, CLEAN STEEL TO REMOVE DIRT, GREASE, RUST, AND LOOSE MILL SCALE IN ACCORDANCE WITH SSPC-SP6 / NACE 3 "COMMERCIAL BLAST CLEANING."

R. IMMEDIATELY AFTER SURFACE PREPARATION, APPLY STRUCTURAL STEEL PRIMER PAINT IN ACCORDANCE WITH MANUFACTURER'S INSTRUCTIONS AND AT A RATE TO PROVIDE A UNIFORM DRY-FILM THICKNESS OF 3 MILS. USE PAINTING METHODS WHICH WILL RESULT IN FULL COVERAGE OF JOINTS, CORNERS, EDGES, AND EXPOSED SURFACES.

S. TOUCH-UP PRIMER AND FINISH PAINT TO ALL DAMAGE NEW AND EXISTING FRAMING ONCE ERECTION IS COMPLETE.

T. CONTRACTOR SHALL SUBMIT DETAILED STEEL SHOP DRAWINGS FOR REVIEW & APPROVAL PRIOR TO FABRICATION.

## CAST-IN-PLACE CONCRETE NOTES:

1. COMPLY WITH THE LATEST EDITION OF THE FOLLOWING:
ACI 301 "SPECIFICATIONS FOR STRUCTURAL CONCRETE FOR BUILDINGS"
ACI 304 "GUIDE FOR MEASURING, MIXING, TRANSPORTING, AND PLACING CONCRETE"
ACI 305 "HOT WEATHER CONCRETING"
ACI 306 "COLD WEATHER CONCRETING"
ACI 318 "BUILDING CODE REQUIREMENTS FOR STRUCTURAL CONCRETE"

2. CONCRETE MIX DESIGN: MINIMUM 4000 psi HIGH EARLY COMPRESSIVE STRENGTH, 0.48 MAXIMUM WATER CEMENT RATIO, 5-7 PERCENT AIR CONTENT, AND 5" MAXIMUM SLUMP.

3. DEFORMED BARS: ASTM A 615, GRADE 60; TIES AND STIRRUPS, GRADE 40. DEFORMED BARS TO BE WELDED: ASTM A 706.

4. PORTLAND CEMENT: ASTM C 150, TYPE I OR II.

5. AGGREGATES: ASTM C 33 (NORMAL WEIGHT), ONE SOURCE, AND AS HEREIN SPECIFIED
FINE AGGREGATE: CLEAN, SHARP, NATURAL SAND FREE FROM LOAM, CLAY, LUMPS, OR OTHER DELETERIOUS SUBSTANCES.
COARSE AGGREGATE: CLEAN, UNCOATED, PROCESSED AGGREGATE FREE FROM CLAY, MUD, LOAM, OR FOREIGN MATTER. SIZE NUMBER 89 PER ASTM C-33

6. AIR ENTRAINING: ASTM C 260.

7. WATER REDUCING ADMIXTURE: ASTM C 494, TYPE D.

8. FLY ASH: ASTM C 618, TYPE F, WITH A LOSS ON IGNITION OF LESS THAN 4 PERCENT.

9. SUPPORTS FOR REINFORCEMENT: BOLSTERS, CHAIRS, SPACERS, AND ALL OTHER DEVICES FOR SPACING SUPPORTING AND FASTENING REINFORCING BARS IN PLACE. USE WIRE-BAR TYPE OR ALL PLASTIC TYPE SUPPORTS COMPLYING WITH CRSI SPECIFICATIONS. USE CHAIRS WITH SAND PLATES OR HORIZONTAL RUNNERS WHERE BASE MATERIAL WILL NOT SUPPORT CHAIR LEGS.

10. PROVIDE SUPPORTS WITH LEGS THAT ARE PLASTIC PROTECTED (CRSI, CLASS 1) OR STAINLESS STEEL PROTECTED (CRSI CLASS 2).

11. BONDING COMPOUND: SIKALATEX BY SIKA CORP.; OR ACCEPTED EQUIVALENT.

12. JOINT SEALANT: "SONOLASTIC SL2" BY SONNEBORN BUILDING PRODUCTS, "SIKAFLEX-2c SL" BY SIKA CORP.; "EUCOLASTIC 2 SL" BY EUCLID CHEMICAL CO.; OR ACCEPTED EQUIVALENT.

13. GENERAL: COMPLY WITH ACI 304, "RECOMMENDED PRACTICE FOR MEASURING, MIXING, TRANSPORTING, AND PLACING CONCRETE," AND AS HEREIN SPECIFIED.

14. CONSOLIDATE PLACED CONCRETE BY MECHANICAL VIBRATING EQUIPMENT SUPPLEMENTED BY HAND SPADING, RODDING, OR TAMPING. USE EQUIPMENT AND PROCEDURES FOR CONSOLIDATION OF CONCRETE IN ACCORDANCE WITH ACI 309.

15. CONCRETE SHALL BE PROTECTED FROM PREMATURE DRYING, EXCESSIVELY HOT OR COLD TEMPERATURE, AND MECHANICAL INJURY ACCORDING TO PROVISIONS OF ACI 301, CHAPTER 12, ACI 305, OR ACI 306, CHAPTER 8.

16. CURING METHODS: PERFORM CURING OF CONCRETE BY WET-CURING OR BY MOISTURE-RETAINING COVER CURING, FOR 7 DAYS.

17. CLEAN CURING AND SEALING COMPOUND (VOC COMPLIANT): ASTM C 309 WITH MINIMUM 18% SOLIDS CONTENT. PRODUCT SHALL BE "DIAMOND CLEAR VOX" BY THE EUCLID CHEMICAL CO.; OR ACCEPTED EQUIVALENT.

18. AFTER CONCRETE HAS CURED, APPLY CLEAN CURING AND SEALING COMPOUND TO ALL EXPOSED CONCRETE SURFACES.

19. MINIMUM 16 GAUGE ANNEALED TIE WIRE, ASTM A 82.

20. CHAMFER STRIPS: PROVIDE WOOD, METAL, PVC, OR RUBBER CHAMPHER STRIPS FABRICATED TO PROVIDE 1-INCH CHAMPHER ON ALL EXPOSED EDGES.

## GENERAL NOTES:

1. DO NOT CHANGE SIZE OR SPACING OF STRUCTURAL ELEMENTS.

2. TAILS SHOWN ARE TYPICAL; SIMILAR DETAILS APPLY TO SIMILAR CONDITIONS UNLESS OTHERWISE INDICATED.

3. THE ENGINEER IS NOT RESPONSIBLE FOR CONSTRUCTION METHODS, MEANS, TECHNIQUES OR PROCEDURES, GENERALLY OR FOR THE CONSTRUCTION MEAN, METHODS, TECHNIQUES OR PROCEDURES FOR COMPLETION OF THE WORK DEPICTED BOTH ON THESE PLANS, AND FOR ANY CONFLICTS/SCOPE REVISIONS WHICH RESULT FROM SAME. CONTRACTOR IS RESPONSIBLE FOR DETERMINING THE METHODS/MEANS FOR COMPLETION OF THE WORK PRIOR TO THE COMMENCEMENT OF CONSTRUCTION

4. THESE DRAWINGS DO NOT INCLUDE NECESSARY COMPONENTS FOR CONSTRUCTION SAFETY.

5. CONTRACTOR SHALL DETERMINE EXACT LOCATION OF EXISTING UTILITIES BEFORE COMMENCING WORK. HE AGREES TO BE FULLY RESPONSIBLE FOR ANY AND ALL DAMAGES WHICH MIGHT BE OCCASIONED BY HIS FAILURE TO EXACTLY LOCATE THESE UTILITIES.

6. CONTRACTOR SHALL NOTIFY THE ENGINEER IN WRITING OF ALL PROPOSED DEVIATIONS OR SUBSTITUTIONS FROM DIMENSIONS, MATERIALS, OR EQUIPMENT SHOWN ON THE DRAWINGS AND MAKE ONLY THOSE DEVIATIONS OR SUBSTITUTIONS ACCEPTABLE TO ENGINEER.

7. DO NOT SCALE DRAWINGS. CONTRACTOR SHALL NOTIFY ENGINEER OF ANY DISCREPANCIES IN DIMENSIONS BETWEEN EXISTING CONDITIONS AND THE STRUCTURAL DRAWINGS.

8. COORDINATE ALL WORK SCHEDULES WITH A SMI REPRESENTATIVE.

9. CONTRACTOR SHALL SUBMIT CONNECTION DETAILS AND SHOP DETAILS TO ENGINEER PRIOR TO FABRICATION.

10. COORDINATE STEEL INSTALLATION WITH EXISTING CONDUIT, CONDUIT TRAYS AND PIPING.

11. CONTRACTOR SHALL VERIFY LATEST DRAWING REVISION WITH THE ENGINEER OF RECORD.

12. THE CONTRACTOR SHALL ASSUME EXISTING PAINT TO BE LEAD-BASED UNLESS OTHERWISE DIRECTED BY THE PROJECT ENGINEER.

13. THE DRAIN PIPE SHALL BE OF ONE CONTINUOUS LENGTH

| SPECIFICATIONS | | | |
|---|---|---|---|
| | SIZE | MATERIAL | SPEC |
| PIPE | 12" | 304SS | ASTM A312 SCHEDULE 40 |
| VALVE | 12" | 304SS | ASTM B16.5 CLASS 150 |
| FLANGE | 12" | 304SS | CLASS 150 RAISED FACE |



UNAUTHORIZED ALTERATION OR ADDITIONS TO A DOCUMENT BEARING THE SEAL OF A LICENSED PROFESSIONAL ENGINEER OR LAND SURVEYOR IS A VIOLATION OF THE CODE OF MASSACHUSETTS REGULATIONS - 250 CMR 5.00 PROFESSIONAL PRACTICE

| C1 | 4/26/2024 | FOR CONSTRUCTION | KTN | LVM | APFD |
|---|---|---|---|---|---|
| C0 | 3/21/2024 | FOR CONSTRUCTION | KTN | LVM | APFD |
| REV | DATE | DESCRIPTION | DRAWN | CHK'D | APP'D |



834 KENWOOD AVENUE
SLINGERLANDS, N.Y. 12159
PHONE: 518-439-6575
FAX: 518-439-6584
Industrial Process Design

MINERALS TECHNOLOGIES
**Specialty Minerals**
SPECIALTY MINERALS
260 COLUMBIA ST.
ADAMS, MA. 01220

TITLE
SPECIALTY MINERALS WTP POND (ISOLATION
NOTES & SPECIFICATIONS

DWG #: 2023-047-71
SHEET: 2 OF 7
DATE: 4/26/2024    REV: C1



NOTES:
1. DO NOT SCALE DRAWING.
2. DRAWING IS TO SCALE ON 'D-SIZE' SHEET ONLY
3. INSTALLATION OF VALVE SHALL BE BASED ON THE VENDOR'S DRAWING
4. COORDINATE ALL ACTIVITIES WITH THE SMI PROJECT MANAGER.
5. SEE DWG SET 2023-047-T1 FOR DETAILED NOTES.

ABANDONED HDPE PIPE TO REMAIN

POND #3 SOUTH POND

MAINTENANCE ROAD

POND #4 NORTH POND

CORRUGATED PIPE TO BE REMOVE

EXISTING STEEL DRAIN PIPE TO BE REMOVED

REMOVE THIS SECTION OF HDPE PIPE @ FLANGES AND INSTALL BLIND FLANGES

CONT. SHALL FIELD VERIFY PIPE Ø

TRENCH

CONTRACTOR SHALL DETERMINE WIDTH & DEPTH OF TRENCH AND COORDINATE W. SMI PROJECT MANAGER

A
C5.4

CONT. SHALL EXCAVATE TRENCH AND REMOVE EXISTING PIPING

ABANDONED HDPE PIPE TO REMAIN

MAINTENANCE ROAD

N DISCHARGE POND ISOLATION - GENERAL ARRANGEMENT PLAN
SCALE: 1/8" = 1'-0"

UNAUTHORIZED ALTERATION OR ADDITIONS TO A DOCUMENT BEARING THE SEAL OF A LICENSED PROFESSIONAL ENGINEER OR LAND SURVEYOR IS A VIOLATION OF THE CODE OF MASSACHUSETTS REGULATIONS - 250 CMR 5.00 PROFESSIONAL PRACTICE

| C1 | 4/26/2024 | FOR CONSTRUCTION | | KTN | LVM | APP'D |
| C0 | 3/21/2024 | FOR CONSTRUCTION | | KTN | LVM | APP'D |
| REV | DATE | DESCRIPTION | | DRAWN | CHK'D | APP'D |

MINERALS TECHNOLOGIES

Specialty MINERALS

SPECIALTY MINERALS
260 COLUMBIA ST.
ADAMS, MA 01220

834 KENWOOD AVENUE
SLINGERLANDS, N.Y. 12159
PHONE: 518-439-6575
FAX: 518-439-6584
Industrial Process Design

DWG #: 2023-047-C1
SHEET: 3 OF 7
DATE: 4/26/2024
REV: C1

TITLE:
SPECIALTY MINERALS WTP POND ISOLATION
GENERAL ARRANGEMENT PLAN
PONDS 3 & 4

NOTES:
1. DO NOT SCALE DRAWING.
2. DRAWING IS TO SCALE ON 'D-SIZE' SHEET ONLY
3. INSTALLATION OF VALVE SHALL BE BASED ON THE VENDOR'S DRAWING.
4. COORDINATE ALL ACTIVITIES WITH THE SMI PROJECT MANAGER.
5. SEE DWG SET 2023-047-T1 FOR DETAILED NOTES.

CONTRACTOR TO REMOVE COREGATED PIPE

GRADE - EXISTING ACCESS ROAD

UNDERGROUND PIPING - HDPE

PIPE LENGTH & END FITTINGS - UNKNOWN

UNDERGROUND PIPING - STEEL

POND #3

CONTRACTOR TO REMOVE ALL EXISTING PIPING

POND #4

POND PROFILE UNKNOWN

POND PROFILE UNKNOWN



DISCHARGE POND ISOLATION - ELEVATION LOOKING WEST
SCALE: 3/4" = 1'-0"



UNAUTHORIZED ALTERATION OR ADDITIONS TO A DOCUMENT BEARING THE SEAL OF A LICENSED PROFESSIONAL ENGINEER OR LAND SURVEYOR IS A VIOLATION OF THE CODE OF MASSACHUSETTS REGULATIONS - 250 CMR 5.00 PROFESSIONAL PRACTICE

COMMONWEALTH OF MASSACHUSETTS
BRIAN DAVENPORT No. 58070
PROFESSIONAL ENGINEER

| C1 | 4/26/2024 | FOR CONSTRUCTION | | KTN | LM | APP'D |
| C0 | 3/21/2024 | FOR CONSTRUCTION | | KTN | LM | APP'D |
| REV | DATE | DESCRIPTION | | DRAWN | CHK'D | APP'D |

MINERALS TECHNOLOGIES

**Specialty MINERALS**

SPECIALTY MINERALS
260 COLUMBIA ST.
ADAMS, MA 01220

TITLE
SPECIALTY MINERALS WTP POND ISOLATION
DETAILED PLAN
PONDS 3 & 4



834 KENWOOD AVENUE
SLINGERLANDS, N.Y. 12159
PHONE: 518-439-6575
FAX: 518-439-6584

Industrial Process Design

DWG #: 2023-047-C2
SHEET: 4 OF 7
DATE: 4/26/2024
REV: C1









A B C D E F G H I J K L M N O P Q R

1 2 3 4 5 6 7 8 9 10 11 12

NOTES:
1. DO NOT SCALE DRAWING.
2. DRAWING IS TO SCALE ON 'D-SIZE' SHEET ONLY
3. INSTALLATION OF VALVE SHALL BE BASED ON THE VENDOR'S DRAWING.
4. COORDINATE ALL ACTIVITIES WITH THE SMI PROJECT MANAGER.
5. SEE DWG SET 2023-047-T1 FOR DETAILED NOTES.

ACTUATOR SUPPORT - SEE. SHT 7

12" DIAMETER 304SS
STAINLESS STEEL
SCH40 PIPE

FLOW ►

TRENCH TBD BY CONTRACTOR

C
M-7

CONTRACTOR TO
FIELD VERIFY
LENGTH OF PIPE
BEFORE PURCHASE
(MIN OF 12"
PROTRUSION INTO
EACH POND)

B
C1-6

U-BOLT VALVE STEM
TO SUPPORT

BUTTERFLY VALVE
MATERIAL: 304SS

INSTALL NEW PIPE/VALVE
ASSEMBLY IN SAME
LOCATION AS PREVIOUS PIPE

RIPRAP FOR
EROSION CONTROL

ANTI-SEEPAGE
COLLAR

ANTI-SEEPAGE
COLLAR

1. CONTRACTOR TO FIELD VERIFY ALL SUBGRADE MATERIAL AS FIRM, UNDISTURBED SOIL OR A MINIMUM 12" OF NEW, COMPACTED STRUCTURAL FILL.

2. DRAIN PIPE SHALL BE ONE CONTINUOUS LENGTH OF 12" DIAMETER SCH40 304SS

3. ANTI-SEEPAGE COLLARS SHALL EXTEND A MINIMUM OF 18" BELOW THE PIPE BEDDING MATERIAL AS WELL AS 18" PAST IN BOTH LATERAL DIRECTIONS.

4. CONTRACTOR TO PROVIDE SUBMITAL OF ANTI-SEEPAGE COLLAR TO SMI PM FOR APPROVAL

5. CONTRACTOR TO VERIFY EXACT PLACEMENT OF SEEPAGE COLLARS WITH SMI PM

ANTI-SEEPAGE COLLAR:
MAKE: SCHEIB DRAINAGE
MODEL: ANTISEEP5X5X12

N    DISCHARGE POND ISOLATION - GENERAL ARRANGEMENT PLAN
     SCALE: 3/4" = 1'-0"

UNAUTHORIZED ALTERATION OR ADDITIONS TO A DOCUMENT BEARING THE SEAL OF A LICENSED PROFESSIONAL ENGINEER OR LAND SURVEYOR IS A VIOLATION OF THE CODE OF MASSACHUSETTS REGULATIONS - 250 CMR 5.00 PROFESSIONAL PRACTICE

834 KENWOOD AVENUE
SLINGERLANDS, N.Y. 12159
PHONE: 518-439-6575
FAX: 518-439-6584
Industrial Process Design
DWG #: 2023-047-C3
SHEET: 5 OF 7
DATE: 4/26/2024    REV: C1

Specialty
MINERALS

SPECIALTY MINERALS
260 COLUMBIA ST.
ADAMS, MA. 01220

TITLE:
SPECIALTY MINERALS WTP POND ISOLATION
GENERAL ARRANGEMENT – ELEVATION
PONDS 3 & 4

| C1 | 4/26/2024 | FOR CONSTRUCTION | KTN | LVW | APP'D |
| C0 | 3/21/2024 | FOR CONSTRUCTION | KTN | LVW | APP'D |
| REV | DATE | DESCRIPTION | DRWN | CHK'D | APP'D |



NOTES:
1.  DO NOT SCALE DRAWING.
2.  DRAWING IS TO SCALE ON 'D-SIZE' SHEET ONLY.
3.  INSTALLATION OF VALVE SHALL BE BASED ON THE VENDOR'S DRAWING.
4.  COORDINATE ALL ACTIVITIES WITH THE SMI PROJECT MANAGER.
5.  SEE DWG SET 2023-047-T1 FOR DETAILED NOTES.

ACTUATOR SUPPORT
SEE SHT. 7

VALVE ACTUATOR

PIPE INLET SHALL BE 4' BELOW
THE LOWEST SURFACE GRADE
SURROUNDING POND 3

3'-0"
CONT. TO FIELD
VERIFY WITH
SMI PM

GRADE - VARIES

VALVE STEM EXT. (TBD)

POND #3

CONT. TO ADD FILL DEPENDING ON
ACTUATOR SUPPORT FINAL LOCATION
CONT. TO COORDINATE WITH SMI
PROJECT MANAGER

1'-6"
MIN

BUTTERFLY VALVE
MATERIAL: 304SS

POND #4

NEW 12" SS PIPE FIELD SET
LENGTH + CONT. TO VERIFY

PITCH TOWARD POND 4
1/8" PER FOOT

1'-6"
MIN

1'-6"
MIN

1'-6"
MIN

ADD RIPRAP TO PROTECT
FROM EROSION

ANTI-SEEPAGE
COLLAR

ANTI-SEEPAGE
COLLAR

12" SS RAISED FACE
SLIP ON FLANGE

ADD LAYER OF
COMMERCIAL GRADE
LANDSCAPE FABRIC
UNDER RIPRAP

POND PROFILE UNKNOWN

POND PROFILE UNKNOWN

### DISCHARGE POND ISOLATION - ELEVATION LOOKING WEST
SCALE: 3/4" = 1'-0"

UNAUTHORIZED ALTERATION OR
ADDITIONS TO A DOCUMENT
BEARING THE SEAL OF A LICENSED
PROFESSIONAL ENGINEER OR LAND
SURVEYOR IS A VIOLATION OF THE
CODE OF MASSACHUSETTS
REGULATIONS - 250 CMR 5.00
PROFESSIONAL PRACTICE

| REV | DATE | DESCRIPTION | | | |
|---|---|---|---|---|---|
| C1 | 4/26/2024 | FOR CONSTRUCTION | KTN | LVW | APP'D |
| C0 | 3/21/2024 | FOR CONSTRUCTION | KTN | LVW | APP'D |
| REV | DATE | DESCRIPTION | DRAWN | CHK'D | APP'D |

Specialty
MINERALS

SPECIALTY MINERALS
360 COLUMBIA ST.
ADAMS, MA. 01220

Industrial Process Design
834 KENWOOD AVENUE
SLINGERLANDS, N.Y. 12159
PHONE: 518-439-6575
FAX: 518-439-6584

TITLE:
SPECIALTY MINERALS WTP POND ISOLATION
GENERAL ARRANGEMENT — ELEVATION
PONDS 3 & 4

DWG #:  2023-047-C4
SHEET: 6 OF 7
DATE:  4/26/2024
REV:   C1

NOTES:
1. DO NOT SCALE DRAWING.
2. DRAWING IS TO SCALE ON 'D-SIZE' SHEET ONLY
3. INSTALLATION OF VALVE SHALL BE BASED ON THE VENDOR'S DRAWING.
4. COORDINATE ALL ACTIVITIES WITH THE SMI PROJECT MANAGER.
5. SEE DWG SET 2023-047-T1 FOR DETAILED NOTES.



CONTRACTOR TO DETERMINE LENGTH BASED ON FINAL LOCATION OF BASE

4" SCH. 40 PIPE WITH 3/16" ENDCAP

3/4"Ø ASTM A193 Gr. B7 ANCHOR WITH 6-3/4" EMBEDMENT SET IN C6 EPOXY ADHESIVE BY RED HEAD OR APPROVED EQUIVALENT (4-TYP.)

5/8"x8"x0'-8" BASEPLATE OVER 1" THICK HIGH-STRENGTH NON-SHRINK GROUT (TYP.)

FOUR (4)-# 5 BARS EQUALLY SPACED WITH #3 TIES AT 12" C-C (TYP.)

12" Ø
SEE SHT. 2 FOR DETAIL NOTES

3'-0" ±
SET IN FIELD

4'-0" MIN

FIRM UNDISTURBED SOIL OR MIN. 12" COMPACTED STRUCTURAL FILL (TYP.)

COMPACTED STRUCTURAL FILL;
STRUCTURAL FILL MATERIAL SHALL BE COMPACTED CRUSHER RUN. (NYSDOT ITEM 304.12 M SUBBASE COURSE, COMPACTED TO 95% AT A MAXIMUM DRY DENSITY AS DETERMINED BY ASTM D1557 AND WITHIN PLUS OR MINUS 3% OPTIMUM MOISTURE CONTENT

**1** NEW ACTUATOR SUPPORT ELEVATION
SCALE 1 1/2"=1'-0"



12" STRUCTURAL FILL MATERIAL: COMPACTED CRUSHER RUN (NYSDOT ITEM 304.12 M SUBBASE COURSE, COMPACTED TO 95% AT A MAXIMUM DRY DENSITY AS DETERMINED BY ASTM D1557 AND WITHIN PLUS OR MINUS 3% OPTIMUM MOISTURE CONTENT)

EXIST. SUBBASE COURSE

WOVEN CONSTRUCTION FABRIC AMOCO 2006 OR APPROVED EQUAL

TRENCH WALLS LAID BACK PER OSHA REQM'TS OR SHEETING A.O.B.E.

PLASTIC, MAGNETIC 3" WIDE DETECTABLE TAPE (TYP.)

OUTSIDE CROWN

SPRING LINE

3' MAX.

| GRADATION "A" | |
|---|---|
| SIEVE SIZE | % PASSING BY WEIGHT |
| 1/4" | 100 |
| NO. 50 | 0-35 |
| NO. 100 | 0-10 |

**BORROW:** WELL GRADED INORGANIC GRANULAR SOILS AND/ OR ROCK, MAX. 1½" SIZE, NOT MORE THAN 20% BY WEIGHT PASSING #200 SIEVE OR NATIVE MATERIAL; COMPACT TO 95% MODIFIED PROCTOR (CRUSHER RUN) MAXIMUM 12" LIFTS

**PIPE ZONE BACKFILL:** RUN-OF-BANK SAND, WELL GRADED FREE OF SILT, CLAY, SLAG, CINDER, ASHES, RUBBISH, OR OTHER FOREIGN MATERIAL, SEE GRADATION "A"; COMPACT TO 85% MODIFIED PROCTOR

**PIPE ZONE BEDDING:** NATURAL RUN-OF-BANK SAND, FREE OF LUMPS, FROZEN MATERIAL, SLAG, CINDER, ASHES, RUBBISH, OR OTHER FOREIGN MATERIAL. SEE GRADATION "A"; COMPACT TO 85% MODIFIED PROCTOR

**1** TYPICAL U.G. PIPE TRENCH DETAIL
SCALE N.T.S.



UNAUTHORIZED ALTERATION OR ADDITIONS TO A DOCUMENT BEARING THE SEAL OF A LICENSED PROFESSIONAL ENGINEER OR LAND SURVEYOR IS A VIOLATION OF THE CODE OF MASSACHUSETTS REGULATIONS –250 CMR 5.00 PROFESSIONAL PRACTICE

| C1 | 4/26/2024 | FOR CONSTRUCTION | KTN | LVW | APFD |
|---|---|---|---|---|---|
| C0 | 3/21/2024 | FOR CONSTRUCTION | KTN | LVW | APFD |
| REV. | DATE. | DESCRIPTION | DRWN | CHK'D | APP'D |



834 KENWOOD AVENUE
SLINGERLANDS, N.Y. 12159
PHONE: 518-439-6575
FAX: 518-439-6584

Industrial Process Design

**Specialty MINERALS**

SPECIALTY MINERALS
260 COLUMBIA ST.
ADAMS, MA. 01220

MINERALS TECHNOLOGIES

TITLE:
SPECIALTY MINERALS WTP POND ISOLATION DETAILS

DWG #: 2023-047-C5
SHEET: 7 OF 7

DATE: 4/26/2024     REV: C1

**EXHIBIT C**



**SCOPE OF WORK**

SMI Discharge Channel
Adams, Massachusetts

Ver. 04/17/2024

***Prepared for:***

Specialty Minerals Inc.
Adams, Massachusetts 02129-1400

***Prepared by:***

Woods Hole Group
107 Waterhouse Drive
Bourne, MA
(508) 540-8080

*This document contains confidential information that is proprietary to the Woods Hole Group, Inc. Neither the entire document nor any of the information contained therein should be disclosed or reproduced in whole or in part, beyond the intended purpose of this submission without the express written consent of the Woods Hole Group, Inc.*



**Table of Contents**

**1.0    INTRODUCTION** ................................................................................................ **1**

   1.1    Site Description ....................................................................................... 1

   1.2    Objective ................................................................................................. 2

   1.3    Assumptions ........................................................................................... 2

**2.0    IMPLEMENTATION PLAN** ............................................................................... **2**

   2.1    Overview .................................................................................................. 2

   2.2    Staging ..................................................................................................... 2

   2.3    Identification of Areas of Relocation ................................................. 3

   2.4    Material Collection ................................................................................. 4

   2.5    Best Management Practices (BMPs) ..................................................... 4

   2.6    Documentation ....................................................................................... 5

   2.7    Relocation of Material from the Discharge Channel ........................ 6

   2.8    Post-Relocation Observation ............................................................... 6

**3.0    CONCLUSIONS** ................................................................................................ **6**

**List of Figures**

Figure 1    General location of the Discharge Channel
Figure 2    Waterfall at the up-channel boundary of the Discharge Channel
Figure 3    Stone observed along the edge of the Discharge Channel
Figure 4    Photos of the white deposits in the Discharge Channel
Figure 5    Example of woody debris in the Discharge Channel

**Table**

Table 1    Not-to-Exceed Area/Depth/Volume of Deposits to be Relocated

**Exhibits**

Exhibit A    AORs Mapped with RTK GPS waypoints
Exhibit B    Examples of Turbidity Barriers


## 1.0   INTRODUCTION

Specialty Minerals Inc. (SMI) will relocate measurable and readily removable areas of white-ish/grayish deposits (Deposits) from the Discharge Channel (as defined below) at the instruction of the Commonwealth of Massachusetts. This Scope of Work (SOW) provides an overview of the efforts and activities.

### 1.1   Site Description

The area of focus is the discharge channel for SMI's wastewater treatment facility (Figure 1). Based on information from SMI, this discharge channel is approximately 159 feet from west (commencing at a "waterfall") (Figure 2) to east (intersection with the Hoosic River) (Exhibit A) and varies between approximately six feet and ten feet in width with the channel edges defined in places by large stones (Figure 3) (the Discharge Channel). The Discharge Channel serves as a conduit for the permitted discharge of process water and stormwater from the SMI Facility, as well as stormwater more generally from Route 8.

Deposits are present in the Discharge Channel with concentrated areas of accumulation in specific areas (Exhibit A).  When undisturbed, the water column in the Discharge Channel is clear, while the areas with Deposits under the water column appear less clear.  Water flow is constant in the Discharge Channel from west to east with increased flow during periods of high precipitation.

In terms of biological activity, cattail (*Typha* sp.) were observed growing directly in the Discharge Channel sediment within 50 feet of the waterfall. Multiflora rose (*rosa multiflora*) was observed growing on a hummocky area along the Discharge Channel, as well as up the fringing banks. The fringing bank is also heavily vegetated with herbaceous Virginia creeper (*Parthenocissus quinquefolia*) and river grape (*Vitis riparia*), japanese knotweed (*Polygonum cuspidatum*),morrows honeysuckle (*Lonicera morrowii*), and cottonwood (*Populus deltoides*). Many species on the bank were growing over the water and were being periodically inundated based on white-grayish residue on the leaves and stems. Surface-skimming insects (family *Gerridae*) and schools of unidentified brown minnows were observed in the Discharge Channel water.

Review of the Natural Heritage and Endangered Species Program (NHESP) maps and information provided by the program identify two (2) state-listed rare species that may potentially occur in areas relevant to this SOW:

> Hairy-fruited Sedge (*Carex trichocarpa*)

> Longnose Sucker *(Catostomus Catostomus)*



A wetland scientist will confirm, in coordination with NHESP,[1] that activities along and within the Discharge Channel do not impact listed rare species (in general). However, a formal survey for the rare species will not be conducted.

### 1.2 Objective

This SOW has been developed to guide the relocation of the identified areas of the Deposits within the Discharge Channel with minimal impact on the Discharge Channel's hydrology, ecology, and operations. As a result, the targeted relocations focus on areas in which the Deposits have a notable and readily removable volume. Because of its role conveying process water and stormwater, the Discharge Channel has white-ish/grayish deposits in and along its bottom. As the Discharge Channel continues to be used for these purposes, the objective is not to relocate all of the Deposits, but instead to relocate those portions of Deposits that are in predetermined locations.

### 1.3 Assumptions

Pursuant to the Consent Decree, the Consent Decree and this SOW constitute DEP and DFW's authorization to conduct the Deposit removal in the Discharge Channel as set forth herein.[2]

## 2.0 IMPLEMENTATION PLAN

### 2.1 Overview

In order to successfully meet the project objective, the implementation plan includes staging, implementation of best management practices, documentation, and post-relocation observation.

After considering the volume of material to be relocated, access to and conditions in the Discharge Channel, efficiency and timing, the Project Team selected manual removal with hand tools as the least impactful and most appropriate and effective method.

### 2.2 Staging

Although heavy equipment will not be employed while implementing this SOW, given that access requires movement through forested floodplain and down steep banks along portions of the Discharge Channel, establishing a staging area will improve the efficiency of the process. The staging area will include an area for receiving the material to be relocated and transferring that material to a vehicle for transfer to the ultimate disposal location (*see* 2.7). A support crew will assist in moving the filled buckets and providing empty buckets for the next removal. SMI will ensure that sufficient crew members are available to receive the material, estimate the volume, note observations, transfer to a container for transit to the ultimate disposal area, and provide the crew in the Discharge Channel with empty buckets. Another important component of setting

---

[1] Informal outreach to NHSEP will occur as plan develops.

[2] SMI also plans to reach out to Adams Con Com, with the assistance of MassDEP.


up a staging location, is identifying the best and safest pathways for accessing the Discharge Channel.

There are slopes on either side of the Discharge Channel.  Based on a preliminary review, access at the start of the Discharge Channel (west end) and from the drier north side of the Discharge Channel will have the least impact.  Given that access will be by foot and access will be limited to at most two days, we do not expect that mats or additional protections will be needed. The final access points will account for the weight of the buckets, likely heavy with the material, and efforts will be made to minimize activity in the Discharge Channel to avoid unnecessary disturbance and turbidity that may reduce the effectiveness of relocation efforts.  SMI, in concert with WHG and in consultation with DEP, will plan the locations for entry and exit from the Discharge Channel and routes to the staging area in advance.

### 2.3    Identification of Areas of Relocation

SMI personnel completed an initial reconnaissance of the Discharge Channel. As part of this reconnaissance, field crews identified areas that contained certain Deposits to be relocated.  On March 28, 2024, WHG personnel conducted a follow-up site visit. Along with SMI personnel, WHG attempted to locate the previously identified areas and map them by GPS waypoints using a RTK (Real-Time Kinematic). Due to the dynamic nature of the Discharge Channel, some of the previously identified areas had changed.

Based on these field reviews and consultation with DEP, there are six Areas of Relocation (AORs) on which the field crew will focus; additionally, larger woody debris (primarily limbs/trunks with a diameter of approximately 5" to 10") will be removed from the Discharge Channel. The AORs and the larger woody debris are each identified on **Exhibit A**, attached hereto and made a part hereof, which reflects conditions observed on March 28, 2024, and utilizes RTK GPS waypoints to map features. The area and depths of material to be relocated were estimated based the March 28, 2024, site visit. The volumes provided are anticipated not-to-exceed volumes of Deposits. The Discharge Channel is not a static feature. It is a dynamic feature subject to changes in flow due to many factors, including storms, flooding, weather, snow melt, and operational changes. As a result, the AORs currently mapped may change in nature prior to execution of this SOW. While executing this SOW, the field crew will, using GPS RTK waypoints, attempt to relocate the AORs identified below; if SMI is unable to relocate an AOR, SMI will consult with DEP to determine whether and, if so, how the AOR may be safely relocated.

The following table provides additional information on the AORs and woody debris. The location of each can be found on Exhibit A.



**Table 1.  Not-to-Exceed Area/Depth/Volume of Deposits to be Relocated**

| AOR | Not-to-Exceed Area/Depth/Volume |
|-----|---------------------------------|
| 1 | 82 square foot area to a depth of ≤ 1 inch (7 cu ft) |
| 2 | 11 square foot area to a depth of ≤ 2 inches (2 cu ft) |
| 3 | 13 square foot area to a depth of ≤ 2 inches (2 cu ft) |
| 4 | 6 square foot area to a depth of ≤ 2 inches (1 cu ft) |
| 5A | 17 square feet area to a depth of ≤ 2 inches (3 cu ft) |
| 5B | 11 square feet area to a depth of ≤ 2 inches (2 cu ft) |
| 6 | 35 square foot area to a depth of ≤ 4 inch (12 cu ft) |

The not-to-exceed total volume targeted for relocation is 30 cu ft (1.1 yds). If SMI and WHG determine that relocation of additional material associated with the AORs is consistent with the Consent Decree and this SOW, SMI will notify the AGO, DEP, and DFW via e-mail.

SMI will provide notice to the AGO, DEP, and DFW via e-mail at least seven (7) days prior to the commencement of the relocation of the AORs. SMI will work in good faith with DEP and DFW to arrange for representatives from DEP and/or DFW to observe the Discharge Channel and AORs prior to the commencement of the relocation of the AORs, if such a visit is requested, and SMI understands that representatives from DEP and/or DFW may elect to observe the relocation of the AORs in an effort to ensure such relocation is consistent with this SOW.

### 2.4    Material Collection

The material will be removed using hand tools (e.g., shovels).  This approach increases flexibility to adjust where removals occur based on in-the-field observations and limits overall disturbance.  Because of the nature of the Discharge Channel bed when disturbed, activities taking place in the Discharge Channel itself will begin at the most eastern (down-channel) location near the Hoosic River (i.e., AOR 6) with work proceeding to the west (up-channel). Starting at the end of the Discharge Channel will ensure that the locations to the west are not obscured by the efforts further down-channel.

In order to minimize potential impacts to the Hoosic River from the efforts consistent with this SOW, a single turbidity curtain will be installed perpendicular to the Discharge Channel and spanning the Discharge Channel's full width at a location east of AOR 6 and proximate to the intersection with the Hoosic River. The curtain will help reduce the amount of re-suspended matter (target white deposits, calcium carbonate materials, silts, etc.) exiting the Discharge Channel from implementation of this SOW. The curtain will be installed prior to beginning any work in the Discharge Channel. During the active removal, the curtain will be checked periodically (e.g., no less than once an hour) to be sure that it remains in place and operates correctly.

*See Proprietary Note on Title Page*



At each AOR, the crew will identify the area to be removed, estimate the square footage and begin removing the Deposit consistent with this SOW and the not-to-exceed limitations. WHG believes that using a fixed volume container with a handle, such as a 5-gallon bucket, will be the most efficient approach because it can be transported by foot, the crew can estimate the volume of each bucket (e.g., half of a 5-gallon bucket), and it can be handed off to other crew members. Efforts will be made to limit disturbance during the process.

In addition to relocating the Deposits in the AORs, woody debris (Figure 5) will also be relocated and collected in the wood debris area on SMI's site to the west of Route 8. After the relocation has been completed, the western side of the turbidity curtain will be checked for accumulated material and removed with care to limit the potential for material entering the Hoosic River. Any measurable material captured by the curtain will be added to the material for relocation to dry and ultimately be placed within SMI's on-site permitted minerals management landfill.

The final number of crew members supporting the in-channel removal will be determined by SMI, but multiple members will be needed to facilitate removal and transport, minimize impact, and maintain the safety of those working in the Discharge Channel.

### 2.5    Best Management Practices (BMPs)

Work shall be done at a time when there has been no precipitation within the previous 48 hours or anticipated within the 48 hours post-work and the Hoosic River is not at flood stage.

Throughout the process, the crew supervisor will emphasize the need to minimize disturbance. In terms of accessing the Discharge Channel, the crew supervisor will identify paths that limit future vulnerability to erosion, choose areas with some ground vegetation to limit loss of soil, and avoid using a single point of entry. As noted, the crew in the Discharge Channel will undertake efforts to limit movement in the Discharge Channel. When practicable, the crew will attempt to walk along the sides of the Discharge Channel to limit impact.

Consistent with good practices, a wetlands scientist from WHG and a Licensed Wastewater Treatment Operator from SMI will oversee the relocation and serve as the crew supervisors. It is anticipated the removal will take one to two days to complete.

Within the Discharge Channel, the crew will work to limit the release/resuspension of material from the bed of the Discharge Channel. This will be accomplished by limiting the size of each work location, using shovels instead of machines, and maintaining compliance with BMPs. Care will be taken when emptying each shovel full into the bucket to avoid spillage. In addition, when possible and safe, full buckets will be passed among crew members rather than carried through the Discharge Channel. Overfilled buckets will be avoided to limit spillage.



In addition, as described above, a turbidity curtain[3] will be deployed immediately up-channel of the intersection with the Hoosic River. Because of the Discharge Channel flow, care will have to be taken to orient the curtain perpendicular to the Discharge Channel and properly anchor the same to limit the potential for breakthrough. Frequent checks of the curtain will be scheduled to ensure it is functioning appropriately. Also, upon removal, care will be taken to remove the curtain with the trapped material in a manner that best limits release of such material downstream. The trapped material will be removed in the staging area and relocated with the removed Deposits. A turbidity curtain substantially similar to an AER-FLO Type 1.DOT or Type 2.DOT[4] will be utilized.

With the flow in the Discharge Channel remaining constant and the minimal volume removed at each location, any anomaly in the bed will fill in naturally; however large divots will not be left behind and areas will be relatively level post removal.

### 2.6 Documentation

During the removal of Deposits, the crew will take notes and photos and record GPS waypoints for each AOR using a RTK (Real-Time Kinematic) for cm accuracy.

Relocation activities will be documented contemporaneously by crew supervisors. Qualitative observations of material characteristics and of activity conditions and events will be included in this documentation. A field notebook will be used to record observations. All daily field activities will be documented in indelible ink in a notebook.

At a minimum, the following information will be recorded daily in a notebook:

- Date and time of entry (24-hour clock)
- Time and duration of activity at each AOR
- Brief narrative description of weather conditions and channel flow
- Visual observations of turbidity, including digital photographs, before, during, and after removal at each AOR
- Approximate square footage and depth of removal, including material deviations from the areas, depths, and volumes in Table 1
- Estimated total volume removed at each AOR
- Name of person making entries and other field personnel

---

[3] Flexible, impermeable barrier used to trap sediment in water bodies. This curtain is generally weighted at the bottom to ensure that sediment does not travel under the curtain, which is supported at the top through a flotation system. FROM: https://www.michigan.gov/-/media/Project/Websites/egle/Documents/Programs/WRD/NPS/Tech/BMP/bmp-turbidity-curtain.pdf?rev=2afe94e202af432e80d8cba0d86cf57e#:~:text=Definition,top%20through%20a%20flotation%20system.

[4] https://www.aerfloenv.com/three-types-of-floating-turbidity-barriers/ *See* **Exhibit B** for a spec sheet.

*See Proprietary Note on Title Page*



- GPS waypoints of each AOR
- Photos taken at each AOR (photo number ranges)

### 2.7  Relocation of Material from the Discharge Channel

The SMI facility has both a permitted minerals management area landfill and an area for disposal of wooded debris from normal operations. After documentation has been completed (*see* 2.6), materials removed from the Discharge Channel will be relocated by truck to SMI's permitted on-property landfill located west of Route 8 and co-deposited.  Any wooded debris removed from the Discharge Channel will be collected and relocated in the area west of Route 8 used for disposal of wooded debris from normal operations.

### 2.8  Post-Relocation Observation

Observations, field observations, and photographs of the Discharge Channel's conditions before, during, and after the activities described in this SOW will document that efforts have been undertaken and work completed consistent with this SOW. Such observations will be collected into a final report detailing the work done pursuant to this Scope of Work, including before and after photographs.

## 3.0  CONCLUSIONS

A carefully planned and implemented relocation program, in line with the above parameters and practices set forth in this SOW, will allow for the relocation of Deposits from the Discharge Channel while limiting impact in the Discharge Channel and the Hoosic River.

*See Proprietary Note on Title Page*

# FIGURES



**Figure 1.  General location of the Discharge Channel**



**Figure 2.  Waterfall at the up-channel boundary of the Discharge Channel**



**Figure 3. Stone observed along the edge of the Discharge Channel**



**Figure 4.  Photos of the white deposits in the Discharge Channel.**
**Note**: The whitish color is from the deposits and the water column is comparatively clear



**Figure 7.  Example of woody debris in the Discharge Channel**

**EXHIBIT A**



## March 28, 2024 RTK points

- 🟢 Base, fallen tree #1
- 🟩 Base, fallen tree #2
- ⬟ Base, fallen tree #3
- Potential Channel Access
- AORs
- Top of Bank
- Water line

AOR 1

AOR 2

AOR 3

AOR 4

AOR 5A

AOR 5B

AOR 6

Approximate intersection with Hoosic River

0  15  30  60 Feet

N

# EXHIBIT B




# Tough-Guy® Floating Turbidity Barrier
# Type 1.DOT

## *Specifications*

Fabric: 18oz. nominal PVC coated polyester

| | |
|---|---|
| Base Fabric (100% Polyester) | 1000D x 1000D  /  9 x 9 |
| Weight (FS-191-5041) | 18oz/yard² |
| Tensile Strength, Grab (ASTM 4632) | 325 lbs x 310 lbs |
| Tear Strength, Tongue (ASTM 2261) | 55 lbs x 45 lbs |
| Elongation (ASTM 4632) | 21% x 21% |
| Adhesion Strength (ASTM 751) | 17 x 17 lbs/inch |
| Abrasion Resistance (ASTM 4833) | 325 cycles |
| Hydrostatic Resistance (ASTM 751) | At least 660 lbs/inch² |
| UV Resistance (Weather-O-Meter) | Not excessive fading after 1000 HRS |
| Cold Crack Resistance (ASTM 2136) | -40° F |
| High Temperature Resistance (ASTM 2136) | 180° F (Does not Block) |
| Flame Resistance | Pass |
| Special Treatment(s) | Anti Mildew |

All seam heat sealed
5/8" diameter poly rope reinforced vertical edges
#4 brass grommets
1/4" galvanized chain ballast
EPS flotation foam:  6" x 6", 13.5 lb./ft. buoyancy in fresh water and 14.4 lb./ft. buoyancy in saltwater

MADE IN THE USA



**Manufactured by Aer.Flo, Inc.**
**Bradenton, FL**

Sold by Authorized Distributors                    © 2015 Aer.Flo, Inc.



4455 18th Street East, Bradenton, FL 34203
800.823.7356 • www.aerflo.com



## Tough-Guy® Floating Turbidity Barrier
### Type 2.DOT

### Specifications (ST: 6/12)

**Fabric – 20 mil, 18 oz. nominal PVC covered polyester**
**All seams heat sealed**
**5/8 inch poly rope reinforced vertical edges**
**#5 brass grommets**
**5/16 in. galvanized steel 7 x 19 load cable with PVC coating in top, 10,000 lb. break strength**
**5/16 in. galvanized chain ballast in bottom**
**Aluminum stress plates at cable and chain termination**
**EPS flotation, (8 in. x 8 in. standard), 26.7 lb./ft. buoyancy in fresh water, 28.4 lb./ft in saltwater.**
**PVC Slotted Tube End Connectors optional**

MADE IN THE USA



Manufactured by Aer-Flo, Inc.
Bradenton, FL

Sold by Authorized Distributors                              © 2015 Aer-Flo, Inc.